QUINN EMANUEL URQUHART & SULLIVAN, LLP
Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
Ryan S. Landes (Bar No. 252642)
  ryanlandes@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:     (213) 443-3000
Facsimile:      (213) 443-3100

Paulina Slagter (Bar No. 318559)
  paulinaslagter@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone:     (650) 801 5000
Facsimile:      (650) 801 5100

*Attorneys for Plaintiff
CureIS Healthcare, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CureIS Healthcare, Inc.,<br><br>    Plaintiff,<br><br>    vs.<br><br>Epic Systems Corporation,<br><br>    Defendant. | Case No. 3:25-cv-04108-MMC<br><br>**CUREIS HEALTHCARE, INC.'S OPPOSITION TO DEFENDANT EPIC SYSTEMS CORPORATION'S MOTION TO TRANSFER VENUE TO THE WESTERN DISTRICT OF WISCONSIN PURSUANT TO 28 U.S.C. § 1404(a)**<br><br>Hearing Date:    July 25, 2025<br><br>Time:              9:00 a.m.<br><br>Judge:             Hon. Maxine M. Chesney |

CureIS respectfully requests that the Court deny Epic's motion to transfer venue. While Epic's motion relies heavily on its own location, it fails to adequately account for the deference owed to Plaintiff's choice of forum and the fact that the center of gravity for this case is the Northern District of California.

## INTRODUCTION

Plaintiff CureIS Healthcare, Inc. ("CureIS") is and has always been a California-focused organization. Since its inception, most of its business relationships, client engagements, and operational infrastructure have been concentrated in California. Compl. ¶ 51. This focus is intentional, as California has long represented CureIS's strongest and most vital market. Sawotin Decl. ¶¶ 5-6.

California remains the state with the highest number of CureIS customers by a significant margin; no other state even comes close. Additionally, the importance of CureIS's California clients to CureIS's success is substantial: nearly 60% of the company's total revenue is derived from clients based in California. *Id.* ¶ 6. These clients are not peripheral or "cherry-pick[ed] … to manufacture venue," as Epic incorrectly argues (Mot. at 4); they are central to CureIS's business and mission and will provide the key witnesses to CureIS's claims regarding Epic's trade secrets misappropriation, tortious interference, and unfair competition.

In short, Epic's conduct has caused direct and disproportionate harm to CureIS's California-based business customers, Sawotin Decl. ¶ 10, and the loss of that longstanding business is what facially motivates this lawsuit. *See, e.g.*, Dkt. 1, ¶¶ 56, 80, 122-23. The resulting service degradation and operational disruptions have been most acutely experienced in California, affecting California member organizations, California healthcare providers, and the California patients they serve. *Id.*; *see, also, id.*, ¶¶ 7, 10, 11, 51, 53, 56, 70, 80. Transferring this case out of California would remove it from where the harm is most felt and where the majority of Epic's wrongful conduct has occurred (and continues to occur). *Id.* ¶ 8, 51, 56, 72. It also disregards the fact that California has always been the operational and strategic center of CureIS's business activities and those of Epic, as more fully explained in *infra*, Part V.A.

Epic's Motion is replete with mischaracterizations, such as that CureIS's claims arise from Epic innovating or enhancing its own products or from Epic touting its actual features or capabilities. To the contrary, CureIS's claims are based on Epic lying to CureIS customers about Epic's features and innovations to induce them to breach their contracts with CureIS for the purpose of *stifling* innovation. But regardless, these assertions are irrelevant to the transfer analysis and they miss the point. If Epic's defense is that "CureIS [failed] to meet its customers' needs," Mot. at 2, then the only meaningful way to test that claim is to ask the customers themselves—most of whom are located in California. Apart from Epic's convenience, Wisconsin has little interest in the claims or harmed parties in this case—and certainly not more than California. All of the arguments Epic advances in its motion can be summarized by reference to its broader anticompetitive strategy: just as in its dealings with CureIS's customers, Epic seeks to impose an Epic-first policy on the federal courts. *See, e.g.,* Compl. ¶ 5.

In its Motion, Epic also dismissively characterizes CureIS's complaint as asserting "seven kitchen-sink causes of action" that read "like a bad spy novel." Mot. at 1. Putting aside the arrogance of that argument, it is notable that the vast majority of the cast of this particular tale is based in or has far more contact with California than Wisconsin, if they have any contact with Wisconsin at all. And this tale also involves the few Wisconsin-based characters (Epic's employees) actively reaching out again and again to California to harm CureIS and interfere with its relationships there. Because the center of gravity of this case is in this forum, Epic's motion to transfer should be denied.

## FACTUAL BACKGROUND

### I.     CureIS Caters Predominantly to California Customers

Public sector involvement in the delivery of healthcare in California is unmatched elsewhere in the United States. Medi-Cal, California's Medicaid program, is the largest in the country, covering over 15 million people.[1] *See, e.g.*, Compl. ¶ 16. In fact, California was one of the first states

---

[1] Cal. Health Care Found., *Medi-Cal Facts and Figures Almanac: Essential Source of Coverage for Millions* (June 2024), available at https://www.chcf.org/resource/medi-cal-facts-figures-almanac/ at 2, Executive Summary ("In total, over 15 million Californians relied on the program for health coverage in 2022.")

to experiment with managed care for Medicaid in the early 1970s, moving away from traditional fee-for-service models decades ahead of most other states.[2] CureIS's founding mission was to address the particular challenges faced by managed care organizations, who had been, up until that point, entirely neglected by the healthcare IT sector. *Id.* ¶ 17. For this reason, CureIS's first, largest, and most longstanding customer relationships have been with California managed care organizations ("MCOs") and other entities focused primarily on managed care. *Id.* ¶¶ 29-31; Sawotin Decl. ¶¶ 5-6.

All but one of the specific customers mentioned in CureIS's complaint operate out of California—and are among the state's largest healthcare organizations. Compl. (throughout). ███████, for example, employs over 57,000 people, operates 23 hospitals, 33 ambulatory surgery centers, and encounters over 3 million patients annually—all in California. Compl. ¶ 53; *see also* Slagter Decl. ¶ 3, Ex. 1. ███████ operates eight hospitals and 19 medical clinics, has over 20,000 employees, and serves over 785,000 patients annually in California. Compl. ¶ 51; Slagter Decl. ¶ 11, Ex. 9. ███████ (together with ███████, ███████) is the commercial health plan affiliated with ███████. Compl. ¶ 51; Slagter Decl. ¶ 11, Ex. 9. ███████, the largest independent physician association in Northern California, has a provider network of over 6,000 primary care physicians and specialists, serving nearly 400,000 patients annually in San Francisco, Sacramento, Stockton, East Bay, Marin, and Sonoma. Compl. ¶ 47; Slagter Decl. ¶ 12, Ex. 10. ███████ operates four major hospitals and a broad outpatient network across Orange and Los Angeles Counties, employing over 14,000 staff and physicians and serving approximately 1.7 million patients annually, making it one of the largest healthcare systems in Southern California. Compl. ¶ 66; Slagter Decl. ¶ 13, Ex. 11. ███████ is one of the largest not-for-profit health systems in California, including dozens of hospitals and hundreds of clinics, more than

---

[2]  *See, generally* Ronald Lagoe, Deborah L. Aspling, & Gert P. Westert, *Current and future developments in managed care in the United States and implications for Europe*, 3 Health Research Policy and Systems (2005); Kaiser Family Foundation, *Medi-Cal Managed Care: An Overview and Key Issues* (Mar. 2016), https://files.kff.org/attachment/issue-brief-medi-cal-managed-care-an-overview-and-key-issues.

125,000 employees, and millions of patient encounters annually in Los Angeles and Orange Counties. Slagter Decl. ¶ 12, Ex. 14.

Since CureIS was founded in 2006, it has had significantly more customers in California than any other state and close to 60% of CureIS's total revenue each year comes from its California customers. Sawotin Decl. ¶¶ 5-6. Over the last decade, CureIS's California customer base has represented between 42% and 31% of all of its total customers. *Id.* Throughout this same period, CureIS has not had a single customer in Wisconsin. *Id.*

## II. The Majority of Epic's Unlawful Conduct Was Directed At and Occurred In California

CureIS's complaint sounds in a variety of tactics Epic used to interfere with and harm CureIS's business. Among other things, Epic made false and disparaging comments to CureIS's California-based customers, leading those customers to terminate their contracts with CureIS. Compl. ¶¶ 81, 99, 112. The contracts with which Epic interfered were all negotiated, executed, and performed in California. *Id.* ¶¶ 102-04. Epic also imposes its anticompetitive and exclusionary Epic-first policy on CureIS's current and former customers in California. *See, e.g., Id.* ¶¶ 5, 50, 57.

Each time one of CureIS's California customers attempted to use a CureIS product but was blocked by Epic, the access restriction was directed to, and inflicted its intended effects in, California. *See, e.g.,* Compl. ¶¶ 70, 78, 80, 126. Every time a CureIS customer experienced a degradation of the quality of their CureIS product, such product degradation occurred in California and caused denials of coverage or delayed payments for medical treatments received in California. *Id.* ¶¶ 5, 16, 27, 74. The enrollment, payment, processing, and claims adjudication problems that CureIS's products were designed to cure—problems Epic's misconduct ensured would persist—wasted the time and resources of California health plans, payers, and providers, and ultimately, the tax dollars of California residents. *See, e.g., id.* ¶¶ 6, 29, 33–36. Every time Epic forced CureIS's former customers to stop using CureIS's products, these avoidable errors, inefficiencies, and costs were passed on to Californians; *not* Wisconsinites. *Id.* ¶¶ 1, 6, 28, 31, 51, 95, 99, 130.

As Epic's Human Resources Director, Jennifer Peterson, stated in her declaration supporting Epic's Motion to Transfer, Dkt. 22-1, "Members of Epic's Tapestry team regularly work with the

Epic customers named in the Complaint," including "to facilitate *the customer's* use of third-party solutions during the implementation process and to develop any features that a customer may request." *Id.* ¶ 11 (emphasis added). In other words, Epic's Tapestry team directed its conduct toward CureIS's California customers, and the facilitation, implementation, and development work relevant to CureIS's claims occurred primarily *in California*. Moreover, the "members of a customer's Epic support team" who "partner" with CureIS's customers partnered with individuals located in California. *Id.* ¶ 13. The "widespread communications" by "Epic's BFFs [**B**est **F**riends **F**orever]" that most matter here were directed to and received by CureIS's customers; again, largely in California. *Id.* ¶ 14. Finally, "request[s] by CureIS to integrate with Epic's technology," as alleged in the Complaint, was likely made by or on behalf of someone in California. *Id.* ¶ 22.

### III. CureIS's Customers and the Majority of the Harm CureIS Suffered Comes From California

Of the seven CureIS customer relationships so far disrupted by Epic, five involve customers based in California: ▇▇▇ is headquartered in ▇▇▇ California; ▇▇▇ is located in ▇▇▇, California; ▇▇▇ is located in ▇▇▇, California; ▇▇▇ is located in ▇▇▇, California (together with ▇▇▇, ▇▇▇); ▇▇▇ is located in ▇▇▇ and ▇▇▇, California.

Further, 14 of the 15 non-party witnesses identified so far are located in California. Sawotin Decl. ¶ 16. For example, ▇▇▇, a ▇▇▇ employee, who personally witnessed Epic's misconduct, is located in ▇▇▇, California. Compl. ¶ 93; Sawotin Decl. ¶ 12. Additionally, ▇▇▇, a ▇▇▇ employee, who was a party to Epic communications disparaging CureIS's products, who handles Revenue Cycle and Managed Care Operations, is located in ▇▇▇, California. Sawotin Decl. ¶ 12. ▇▇▇, a ▇▇▇e employee who witnessed Epic exert significant pressure on ▇▇▇ to terminate its relationship with CureIS, is located in ▇▇▇, California. Sawotin Decl. ¶ 14. ▇▇▇'s CIO, ▇▇▇, to whom ▇▇▇ reported the shortcomings with Epic's purported replacement "solution," is also located in California. Compl. ¶¶ 67-70; Sawotin Decl. ¶ 14. In addition, ▇▇▇ witnesses, ▇▇▇ ▇▇▇, ▇▇▇, ▇▇▇, and ▇▇▇, who were also

closely involved with CureIS's thwarted attempts to integrate with Epic's EHR, Epic's blocking of CureIS's access to data, and Epic's misrepresentations and related misappropriation of CureIS's trade secrets are located in California. Sawotin Decl. ¶ 13. Relevant witnesses with personal knowledge of Epic's interference with CureIS's subscription license agreements with ▉▉▉ such as ▉▉▉▉▉ and ▉▉▉▉▉, are located in ▉▉▉▉ California. *Id.* ¶ 11. Similarly, ▉▉▉▉, a ▉▉▉▉▉▉▉ employee, who has first-hand knowledge of Epic's misrepresentations regarding CureIS's products, is located in California. *Id.* ¶ 15.

None of the 15 third-party witnesses that CureIS has identified so far are located in Wisconsin, and 14 of them are located in California. *See* Sawotin Decl. ¶ 16. Only 2 of the 8 CureIS party witnesses identified by either Epic or CureIS have any connection with Wisconsin, and both of those individuals work remotely. *See* Sawotin Decl. ¶¶ 3-4, 8; Mot. at 3-4. And even if Epic's own employees are located in Wisconsin, those Epic employees cast their eyes toward the Golden State, as they directed their wrongful conduct here again and again. Compl. ¶¶ 50, 52, 55-57, 69-72, 74, 77-80, 84, 90-91, 95, 99; *see also* Peterson Decl. ¶¶ 11-12, 14, 16-17, 19-21, 23.

## LEGAL STANDARD

"[A] defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Vicious Brands, Inc. v. Face Co., LLC*, 2024 WL 4753287, at *12 (N.D. Cal. Nov. 12, 2024).[3] "Transfer is not appropriate" when it "would merely shift rather than eliminate the inconvenience." *Id.* (citing *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) (affirming the denial of a motion to transfer because a transfer would "merely shift rather than eliminate the inconvenience")).

Courts in this district have weighed a variety of non-exhaustive factors when analyzing motions to transfer venue under 28 U.S.C. § 1404. These factors include: "(1) plaintiff's choice of forum; (2) convenience of the parties; (3) convenience of the witnesses; (4) ease of access to the evidence; (5) familiarity of each forum with the applicable law; (6) feasibility of consolidation with

---

[3] Unless otherwise noted, all internal citations, quotation marks, and brackets in case citations are omitted.

other claims; (7) any local interest in the controversy; and (8) the relative court congestion and time of trial in each forum." *Id.* at *11. Courts in the Ninth Circuit also consider "(1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).

## ARGUMENT

Because Epic concedes that venue is proper in this Court, the Court need only determine whether a transfer would serve the parties' and witnesses' convenience and promote the interests of justice. For the reasons discussed below, the analysis strongly favors CureIS's choice of forum.

### A. Plaintiff's Choice of Forum Warrants Substantial Deference

It is black letter law that plaintiff's choice of forum is entitled to substantial deference and "should not be lightly disturbed." *Flotsam of California, Inc. v. Huntington Beach Conf. & Visitors Bureau*, 2007 WL 1152682, at *1 (N.D. Cal. Apr. 18, 2007) (Chesney, J.). Given this substantial deference, the defendant must "demonstrate that the balance of inconveniences substantially weighs in favor of transfer." *Royal Queentex Enters. v. Sara Lee Corp.*, 2000 WL 246599, at *3 (N.D. Cal. Mar. 1, 2000) (citing *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)); *see also Consumer Fin. Prot. Bureau v. Nationwide Biweekly Admin., Inc.*, 2015 WL 4463790, at *3 (N.D. Cal. July 21, 2015) (applying "significant deference" to plaintiff's choice of forum); *STX, Inc. v. Trik Stik, Inc.*, 708 F. Supp. at 1555-56 (N.D. Cal. 1988) (stating that "[t]he plaintiff's choice of forum should not be easily overturned"). Here, CureIS has chosen California (and this District), a choice that is entitled to paramount consideration and substantial deference. *See Decker Coal Co.*, 805 F.2d at 843; *Nationwide Biweekly Admin., Inc.*, 2015 WL 4463790, at *3; *Royal Queentex*, 2000 WL 246599, at *3; *STX, Inc.*, 708 F. Supp. at 1555-56.

Epic argues that because CureIS does not reside in California, and because the conduct giving rise to the claims was directed out of Epic's Wisconsin headquarters, CureIS's forum choice deserves "greatly reduced" deference. *See* Def. Mot. at 8-9.[4] This is not a correct articulation of the law. Where the plaintiff is not a resident of its chosen forum state but nevertheless "conducts a significant portion of business in California," courts still afford "meaningful deference to Plaintiff's choice of forum." *See Vicious Brands, Inc. v. Face Co., LLC*, 2024 WL 4753287, at *12 (N.D. Cal. Nov. 12, 2024).

Epic's citations are not to the contrary. For example, in *Bloom v. Express Servs., Inc.*, 2011 WL 1481402 (N.D. Cal. Apr. 19, 2011), the court afforded reduced deference to plaintiff's forum choice because "the alleged facts supporting the claim" were all based in a different district *and* because (unlike here) the plaintiff there had no significant connection to the chosen forum, in terms of business or any other contact. *Id.* at *2. Here, unlike in *Bloom*, Epic directed its tortious conduct at California healthcare organizations, causing concentrated harm to CureIS in this district—not in Wisconsin. Compl. ¶¶ 11, 14, 40-46, 53-56, 66-72, 73-77.

Similarly, in *Rabinowitz v. Samsung Elecs. Am., Inc.*, 2014 WL 5422576, at *3-4 (N.D. Cal. Oct. 10, 2014), the plaintiffs lacked any meaningful connections to the Northern District of California and no "relevant acts occurred in [the chosen forum]." Here, CureIS has substantial California ties—as noted, nearly 60% of its revenue derives from California customers, and five of the seven disrupted relationships identified in the Complaint involve California entities. Sawotin

---

[4] Epic's reliance on *Bhatia v. Silvergate Bank*, 2023 WL 4937325 (N.D. Cal. Aug. 1, 2023), and *Rabinowitz v. Samsung Elecs. Am., Inc.*, 2014 WL 5422576 (N.D. Cal. Oct. 10, 2014), is misplaced. In those cases, plaintiffs lacked meaningful forum connections. Here, CureIS has substantial California ties—nearly 60% of its revenue derives from California customers, and five of seven disrupted relationships involve California entities. Sawotin Decl. ¶¶ 6, 10. Epic emphasizes Quinn Emanuel's California presence while failing to acknowledge it is a national firm with offices across the country. Further, as *Rabinowitz* correctly holds, counsel location is irrelevant. What matters is where the operative events occurred and where the harm was concentrated—here, California. The Northern District of California is undoubtedly the location where events giving rise to this action occurred inasmuch as Epic's employees disrupted CureIS customers' operations in California, disparaged CureIS to California residents, and targeted its tortious conduct to interfere with contracts negotiated, executed, and performed, in California. Even if *Chesapeake Climate Action Network v. Exp.-Imp. Bank*, 2013 WL 6057824 (N.D. Cal. Nov. 15, 2013), somehow reduces Epic's burden (it does not), Epic must still make a "strong showing" for transfer, which it fails to do.

Decl. ¶¶ 6, 10. Epic implies that CureIS's only connection to California is its counsel's presence here, *see* Mot. at 9 n.4, but this is plainly—dramatically—incorrect. Moreover, this is a puzzling argument given that litigants would obviously want to hire counsel that are familiar with a specific state's laws and practices, rendering their choice of Quinn Emanuel entirely reasonable. But, even if that were not the case, as Epic's own citation (*Rabinowitz*) observes, counsel location is irrelevant. What matters is where the operative events occurred and where the harm was concentrated—here, California. California—and, in particular, the Northern District of California—is undoubtedly the location where a substantial majority of the events giving rise to this action occurred inasmuch as Epic's employees disrupted CureIS customers' operations in California, disparaged CureIS to California residents, and targeted its unfair and unlawful conduct to interfere with contracts negotiated, executed, and performed, in California. *See* Sawotin Decl. ¶ 6, 10; Compl. ¶¶ 11, 14, 40-56, 66-72, 73-77, 79-84.[5]

Given these facts, Epic cannot make a strong showing for transfer, as detailed further below.

### B. The Northern District of California Is A More Convenient Forum Overall Than Wisconsin

It is telling that Epic's Motion does not address whether and how Wisconsin would be more convenient for the vast majority of witnesses who will testify at trial in this case. Indeed, the "convenience of the witnesses" is often considered the "most important factor" in a transfer analysis, but in particular, the convenience of **non-party witnesses** is of critical importance. *Nagy v. United Schutzhund Clubs of Am.*, 2020 WL 7240209, at *1 (N.D. Cal. Dec. 9, 2020) (Chesney, J.) (citing *Martin v. Glob. Tel*Link Corp.*, 2015 WL 2124379, at *4 (N.D. Cal. May 6, 2015)); *In re Ferrero Litig.*, 768 F. Supp. 2d 1074, 1080 (S.D. Cal. 2011) (observing "courts frequently state that the convenience of third party witnesses is more important than that of party witnesses"). In addition to

---

[5] Epic's cases demonstrate a fundamental misunderstanding of where the wrongful conduct occurred. *GLT Technovations, LLC v. Fownes Bros. & Co.*, 2012 WL 1380338, at *4 (N.D. Cal. Apr. 20, 2012), involved proprietary information used at defendant's non-forum offices. Here, Epic, *inter alia*, extracted CureIS's trade secrets through California customers who received confidential information and proposals *in California*. Compl. ¶¶ 85-95. Similarly, *Hawkins v. Gerber Prods. Co.*, 924 F. Supp. 2d 1208, 1215 (S.D. Cal. 2013), a class action case, focused *only* on where marketing decisions were made. But this case is about where Epic targeted its wrongful conduct—blocking data access of California customers (among others) and spreading false security concerns to California customers. *Id.* ¶¶ 58-78.

the convenience of witnesses, courts consider the availability of compulsory process when determining whether transfer is appropriate. *Tech. Credit Corp. v. N.J. Christian Acad., Inc.*, 307 F. Supp. 3d 993, 1004 (N.D. Cal. 2018) (referring to "compulsory process to compel attendance of unwilling non-party witnesses" as a relevant factor).

As discussed below, California is far more convenient for the majority of party and non-party witnesses in this case, and is also the only location where CureIS can compel live testimony at trial of the majority of critical third-party witnesses. Wisconsin is certainly more convenient for *Epic*, but it is not at all convenient for the majority of individuals and entities at issue in this case.

### 1. Wisconsin is not more convenient for both parties

Epic argues that transferring the case to the Western District of Wisconsin would be more convenient for both parties. Mot. at 10. That is incorrect. Transferring the case to the Western District of Wisconsin would not be convenient for both parties—it would simply shift the inconvenience to CureIS, forcing it to bear significant costs litigating across multiple forums, including across California *and* in the Western District of Wisconsin (among others). "Shifting the convenience from one side to the other … is not a valid reason for transferring a case." *LED One Distribution, Inc. v. C.S. Koida LLC*, 2017 WL 2021365, at *8 (N.D. Cal. May 12, 2017) (denying defendants' transfer motion on this basis). The inconvenience to CureIS is substantial. Litigating in Wisconsin would be far more expensive for CureIS because nearly all key non-party witnesses reside in California and are thus beyond the trial subpoena power of the Western District of Wisconsin. Litigating in Wisconsin would require CureIS to initiate a substantial amount of ancillary proceedings in California to obtain necessary discovery, wasting judicial and party resources. Further, many key CureIS witnesses reside in either California or locations that are closer to California than Wisconsin. *See* Sawotin Decl. ¶¶ 8-9.

When assessing the convenience to the parties, courts consider "the extent of the parties' contacts with the forum, including those relating to [plaintiff's] cause of action," as well as the "relative resources of the parties." *McClure v. Panzura, LLC*, 2025 WL 901945, at *5–7 (N.D. Cal. Mar. 25, 2025).

Here, unlike Wisconsin, **both** parties have extensive contacts with California. Epic's own website lists more than 50 California healthcare organizations that "Live With Epic Care Everywhere," including:

> Alameda Health System, Altais, AltaMed, Arrowhead Regional Medical Center, Carelon, Cedars-Sinai Health System, City of Hope, Clinica Sierra Vista, Community Medical Centers, Contra Costa Health, Cottage Health, County of San Mateo, Eisenhower Health, El Camino Hospital, Enloe Medical Center, Epic Management (Beaver Medical Group), Golden Valley Health Centers, Guardant Health, Hill Physicians Medical Group, HOAG MEMORIAL HOSPITAL PRESBYTERIAN, Invitae, iRhythm Technologies, John Muir Health, Kaiser Permanente Northern California, Kaiser Permanente Southern California, Loma Linda University Health and CareConnect Partners, MemorialCare, Molina Care Connections, Montage Health, Natera, North East Medical Services, PDS Health, Prime Healthcare, Rady Children's Hospital, Riverside Medical Clinic, Salinas Valley Health, San Francisco Department of Public Health (SFDPH), San Ysidro Health, Sansum Clinic, Santa Clara Valley Health System, Scripps Health, Sharp HealthCare, Stanford Health Care and Stanford Medicine Partners, Stanford Medicine Children's Health, Sutter Health Affiliates and Community Connect Practices, UC Davis Health, UC Health (San Diego / Irvine / Riverside) and Affiliates, UCLA Health System, UCSF Health, UCSF Children's, Marin Health, and Affiliates, Valley Children's Hospital, and Washington Health.

Slagter Decl. ¶ 4, Ex. 2. These customers represent more of Epic's EHR and Tapestry customers than any other state—and by a wide margin. The next closest is Texas, with 32 customers, followed by New York with 26. Epic has only 16 customers in its home state of Wisconsin. *Id.* Thus, most of ***Epic's*** customers—including those at issue in this very case—are also located in California. In terms of health plans or other payers that use Epic's Tapestry product (which, as the Complaint details, is central to this case, *see, e.g.*, Compl. ¶¶ 25, 29, 119), Epic works with California's largest payers. Many of these are located in the Northern District of California, including Blue Shield of California, Kaiser Permanente, Contra Costa Behavioral Health, and the Alameda County Behavioral Health Department. *Id.* ¶¶ 6-7, Exs. 4, 5.

Epic profits handsomely from these California healthcare organizations, as do the "TCs" ("members of the Technical Services" team, *see* Peterson Decl. ¶ 13), and "BFFs" whose convenience, like Epic's, Epic claims should come first in this transfer analysis. Mot. at 11. Where witnesses are dispersed (like in this case), but a large number of them are in a particular forum (here, California), that warrants proceeding in that forum if it is of plaintiff's choosing. *Kasabele v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 2021 WL 5792838, at *2 (N.D. Cal. Dec. 7, 2021) (Chesney, J) (denying motion to transfer because defendant failed to make a "strong showing of

inconvenience."); *McClure*, 2025 WL 901945, at *3 (finding defendant failed to meet its "affirmative burden" to justify transfer where witnesses were dispersed). Epic does not cite any authority indicating otherwise.[6]

As to "relative resources of the parties," *McClure*, at *5, Epic generates over $5 billion in annual revenue and employs more than 12,000 people. *See, e.g.*, Compl. ¶ 21; Peterson Decl. ¶ 38. CureIS, by contrast, has 53 employees, with the largest concentration in Arizona, and the rest spread across the United States. Sawotin Decl. ¶ 4. CureIS's annual revenues do not come close to five billion dollars. Because Epic dwarfs CureIS in terms of its size and resources, shifting the inconvenience to CureIS, as Epic's motion requests, would be especially inequitable. *See Gelber v. Leonard Wood Mem'l For Eradication of Leprosy*, 2007 WL 1795746, at *4 (N.D. Cal. June 21, 2007) (finding that the "inconvenience to the parties slightly favors this district because transfer would shift the costs onto the party with more limited means" where defendants were "clearly in a better position to absorb the costs of litigation as compared to [the plaintiff]."). Of course, "the best indicator" of a plaintiff's own convenience is "[t]he plaintiff's choice of forum." *ICG Am., Inc. v. Wine of the Month Club, Inc.*, 2009 WL 2843261, at *9 (D. Conn. Aug. 28, 2009). Here, that choice is grounded in California's centrality to this dispute and the parties' substantial, mutual connections to California and customers based in California.

Even if the parties' convenience were neutral, which it is not, Epic's motion should still be denied. "[U]nless the balance of convenience of the parties is ***strongly*** in favor of defendant, the plaintiff's choice of forum should prevail." *In re Xoft, Inc.*, 435 F. App'x 948, 949–50 (Fed. Cir. 2011) (emphasis added). Here, because both Epic and CureIS have significant contacts in California, the convenience of the parties weighs in CureIS's favor, and as discussed further below, the

---

[6] Epic's convenience cases are inapposite. *Bridgeport Enters., Inc. v. ValCom, Inc.*, 2013 WL 12129388 (C.D. Cal. Mar. 29, 2013), involved parties with no connections whatsoever to the chosen forum. In contrast, as noted, both Epic and CureIS maintain substantial California operations, with Epic listing over 50 California healthcare organizations as customers. In *Am. Trading Int'l, Inc. v. MCF Operating, LLC*, 2019 WL 6139113 (C.D. Cal. Sept. 24, 2019), the court granted transfer because witnesses were "located closer to" the transferee district than to California. Here, the critical non-party witnesses—those with firsthand knowledge of Epic's misconduct—reside in California, not Wisconsin. Under *Am. Trading's* analysis, California is the more convenient forum for witness testimony.

convenience of non-party witnesses, often recognized as the most important factor, clearly weighs against transfer.

### 2. California is more convenient for the majority of witnesses

The convenience of witnesses is "the most important factor considered by the court when deciding a motion to transfer for convenience." *Trujillo v. GT USA, Inc.*, 2010 WL 809505, at *2 (N.D. Cal. Mar. 5, 2010) (Chesney, J.). "In balancing the convenience of the witnesses, primary consideration is given to third party, as opposed to employee witnesses." *Id.* (*citing Royal Queentex,* 2000 WL 246599, at *6). In addition to the number of witnesses, the Court should consider "the nature and quality of their testimony in relationship to the issues in the case." *Id.*; *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 497, 501 (C.D. Cal. 1981) ("In assessing the effect of a transfer on the convenience of witnesses, courts consider the effect of a transfer on the availability of certain witnesses, and their live testimony, at trial.")

Here, the vast majority of non-party witnesses with direct first-hand knowledge of Epic's tortious and unlawful conduct live and work in California. These witnesses are critical to the case. In contrast, the only witnesses Epic offers that are potentially relevant to CureIS's claims and for which Western Wisconsin is "more convenient" are Epic's own employees. Mot. at 11. Epic identifies two potential non-parties located outside of California: ▮▮▮▮ and ▮▮▮▮. However, neither are located in Wisconsin. ▮▮▮▮ while presently headquartered in Washington, operates 17 hospitals in California. *See* Slagter Decl. ¶ 14, Ex. 12. Washington is much closer to California than Wisconsin. ▮▮▮▮ while operating hundreds of hospitals across the Midwest, has only one hospital in Wisconsin. For the two potential witnesses outside this Court's subpoena power, one would have a much easier time traveling to California than Wisconsin, and the other may just prefer it (particularly in the winter). In any case, California is the more convenient forum for at least fourteen out of fifteen of the non-party witnesses who personally witnessed Epic's unlawful conduct as relevant to CureIS's complaint. *See* Sawotin Decl. 10-16. This factor clearly weighs in favor of CureIS's chosen forum.

Exhibits attached to Epic's Motion confirm these points—the core CureIS customers underlying this dispute are located in California. (*See*, *e.g.*, Moskowitz Decl., Exs. D & E.) Transferring the case to Wisconsin would impose a greater burden on key third-party witnesses located in California, who are beyond the subpoena power of the Wisconsin court under Rule 45(c)(3)(A). *See Devashrayee v. Union Pacific Railroad Company*, No. 3:22-CV-03756, at 4, 6 (N.D. Cal. Oct. 17, 2022) (Chesney, J.) (finding convenience of witnesses factor "weighs against transfer" where non-party witness resided in the Eastern District of California, "a locale significantly closer to San Francisco than to Omaha," despite fact that Defendant offered party witnesses in Omaha). This limitation would impede CureIS's ability to secure critical testimony from non-party witnesses with direct unbiased knowledge of Epic's misdeeds. Potentially insulating relevant evidence from judicial process by ordering transfer to the Western District of Wisconsin only serves to Epic's advantage.

### 3. Access to proof considerations strongly weigh in favor of California

Access to proof favors keeping the case in California. Again, at least ten important non-party witnesses (likely more) all live and work in California, and no third-party witness or any CureIS witness resides in Wisconsin. *See infra* Part V.C. The California witnesses are among the most important to this case, given Epic targeted its wrongful conduct at them in multiple ways, *e.g.*, pressuring them to terminate their relationships with CureIS, falsely advertising to them, and coercing them to disclose CureIS's trade secret information. *See, e.g.,* Compl. ¶¶ 70, 73, 88, 93, 95, 157.

Epic's argument (Mot. at 15) that a "vast number of documents" are located in Wisconsin disregards the fact that in 2025, most evidence for cases like this is in electronic form. Electronic discovery allows for the efficient exchange of documents regardless of their physical storage location and therefore usually does not support litigation in one forum over another because the burden of producing discovery elsewhere is so small. *Trujillo*, 2010 WL 809505 at *3 (Chesney, J.) ("Given technological advances in document storage and retrieval, transporting documents between districts does not generally create a burden."). Thus, despite Epic's argument that "all relevant

evidence in Epic's possession" is "located within or accessible from the Western District of Wisconsin," because electronic evidence is also accessible from the Northern District of California, but critical non-party witnesses' live trial testimony is ***not*** accessible from the Western District of Wisconsin, this factor weighs against transfer.[7]

In sum, Epic's Motion fails to overcome the strong presumption in favor of CureIS's chosen forum, which is also where the operative facts occurred, where the key non-party witnesses are located, and where the relevant evidence is most accessible.

### C.     The Northern District of California Has A Significant Interest In This Litigation

As discussed above, most of the operative facts alleged in CureIS's complaint occurred within California. California-based entities also experienced the most harm from Epic's conduct, including the degradation of their services and software options—which, in turn, affected California citizens. As such, California has a strong interest in the controversy.[8]

#### 1.     This Court has far more familiarity with applicable law

Epic argues that this factor is neutral because CureIS alleges both federal and state law claims. Mot. at 15. That is completely incorrect. All five state-law claims are California state law claims, and none are Wisconsin claims. *See generally* Compl. In addition, the agreements entered into with CureIS's California customers contain California choice-of-law and forum-selection

---

[7] Epic's reliance on *Barroca v. United States*, No. 19-cv-00699-MMC, 2019 WL 5722383, at *4 (N.D. Cal. Nov. 5, 2019) (Chesney, J.) and *Halcon v. Hain Celestial Grp., Inc.*, No. 21-cv-02156-JST, 2021 WL 11701387, at *4 (N.D. Cal. Nov. 19, 2021) regarding evidence location is outdated in the digital age. While Epic argues documents are in Wisconsin, electronic discovery makes physical location largely irrelevant. Documentary evidence may be electronic, but witness testimony requires physical presence, making California the superior forum for evidence access. Further, significant amounts of documentary evidence here may well be in possession of the non-party witness customers, the majority of which are located in California.

[8] Defendant's local interest authorities are inapposite. In *Romoff v. Johnson & Johnson Consumer Inc.*, 2022 WL 3905301, at *6 (S.D. Cal. Aug. 26, 2022), the court transferred based on defendant's home state interest in regulating resident businesses. But unlike *Romoff*, California has dual interests here—both protecting its businesses from Epic's unfair competition and safeguarding its healthcare system. Defendant's reliance on *Trueforce Glob. Servs., Inc. v. TruEffect, Inc.*, 2020 WL 11231812, at *5 (N.D. Cal. June 1, 2020), where false promises emanated from Colorado with minimal California nexus, ignores that Epic directed its misconduct at California entities, causing concentrated harm here. And *Lightspeed Aviation, Inc. v. Bose Corp.*, 2010 WL 3928624, at *4 (D. Or. Oct. 1, 2010), which Defendant cites regarding jury burden, actually cuts against transfer—California jurors have direct interest in their healthcare system, while Wisconsin jurors would have "little or no relation" to the California healthcare or public fisc impacts at issue.

clauses. As between California and Wisconsin, this factor thus is not neutral in the least because this Court is far more familiar with the state law claims at issue in this case. *See*, *e.g.*, *GENFIT S. A. v. CymaBay Therapeutics Inc.*, 2022 WL 195650, at *2–8 (N.D. Cal. Jan. 21, 2022) (analyzing DTSA, UCL, and intentional interference claims) (Chesney, J.); *E & E Co. v. Kam Hing Enters., Inc.*, 2008 WL 4962991, at *1 (N.D. Cal. Nov. 19, 2008) (Chesney, J.) (analyzing UCL and intentional interference claims); *LegalForce RAPC Worldwide, P.C. v. DeMassa*, 532 F. Supp. 3d 856 (N.D. Cal. 2021) (Chesney, J.) (analyzing UCL claims); *Greenpeace, Inc. v. Walmart Inc.*, 2021 WL 4267536, at *2 (N.D. Cal. Sept. 20, 2021) (same) (Chesney, J.); *Finelite, Inc. v. Ledalite Architectural Prods.*, 2010 WL 3385027, at *2 (N.D. Cal. Aug. 26, 2010) (same) (Chesney, J.); *LegalForce RAPC Worldwide P.C. v. Trademark Engine LLC*, 2018 WL 5734621, at *2 (N.D. Cal. Oct. 31, 2018) (analyzing Lanham Act and UCL claims) (Chesney, J.).

In contrast, and by way of example, there are less than five cases on Westlaw from the Western District of Wisconsin citing to or discussing California Business & Professions Code § 17200, California's unfair competition law. Slagter Decl. ¶ 8, Ex. 6. Yet, there are unsurprisingly over **five thousand** cases discussing California's unfair competition law in the Northern District of California. *Id.* And even addressing the federal claims asserted in this case, there are less than twenty Western District of Wisconsin decisions discussing trade secrets misappropriation under the Defend Trade Secrets Act, but more than 200 such cases in the Northern District of California. *Id.* ¶ 9, Ex. 7. As all of this demonstrates, the Northern District of California's familiarity with the claims at issue in this case clearly weighs against transfer.

### D.    Court Congestion Is Not A Dispositive Factor and Does Not Warrant Transfer

Epic claims that relative court congestion warrants transfer, arguing that civil cases in the Western District of Wisconsin take less than half the time from filing to disposition compared to the Northern District of California, and 29.0 months from filing to trial compared to 49.9 months in this District. Mot. at 17-18. This is not a ground for transferring the case, especially where (as here) all other relevant factors weigh so strongly against it.

First, "the case authority is mixed regarding whether docket congestion is even a valid consideration [for transfer]." *STX, Inc.*, 708 F. Supp. at 1556; *see also Washington Pub. Util. Group v. United States Dist. Ct.*, 843 F.2d 319, 326 (9th Cir. 1987) ("[A] federal court may not order transfer under section 1404(a) solely for its convenience.").

Second, this factor is relatively disfavored, and this Court is not so congested that it cannot handle this case. *See Royal Queentex*, at *8 ("Relative court congestion is at best, a minor factor in the section 1404 calculus."); *United States v. Switzer Bros*, 115 F. Supp. 49, 51-52 (N.D. Cal. 1953) ("While this court, like other federal district courts in metropolitan areas, is burdened with a heavy volume of litigation, this does not appear to be a sound reason to shift the venue."); *Securities and Exchange Comm'n v. Christian Stanley, Inc.*, 2012 WL 13012496, at *4 (C.D. Cal. April 4, 2012) ("[A]dministrative considerations such as docket congestion are given little weight in this circuit in assessing the propriety of a § 1404(a) transfer") (internal quotation, alteration, and citation omitted).

Third, even if a valid factor, "a plaintiff's choice of forum should be displaced by a court's perception about speed of access to trial in another jurisdiction only in the most extraordinary circumstances." *Linear Tech. Corp. v. Analog Devices, Inc.*, 1995 WL 225672, at *4 (N.D. Cal. Mar. 10, 1995). Those extraordinary circumstances are entirely lacking here. Indeed, Epic identifies no such "extraordinary circumstances" anywhere in its motion—it just argues that it would be more convenient for Epic to litigate in its home District.

### E. The Equities Strongly Favor CureIS's Choice of Forum

The balance of equities and the overall interests of justice warrant denying Epic's motion and keeping the case in this Court and in California. *See* 28 U.S.C. § 1404(a); *Jones*, 211 F.3d at 498-99; *Decker Coal Co.*, 805 F.2d at 843; *Royal Queentex Enterprises*, 2000 WL 246599, at *2. Under Section 1404(a), "the statutory text requires consideration of the interest of justice, which, in this circuit, includes the relevant public policy of the forum state." *DePuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*, 28 F.4th 956, 966 (9th Cir. 2022) (discussing the District Court's decision to deny transfer based in part on California's public policy under Labor Code section 925).

California's strong public policy interests support adjudication in this forum. California has a substantial interest in protecting **all** of its businesses and consumers from unfair competition and false advertising. *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, (1999) (recognizing that "a major purpose" of California's Unfair Competition Law is "the preservation of fair business competition.") This is particularly the case when the alleged misconduct was directed mostly at California-based healthcare organizations serving California patients. The state's interest in a plaintiff enforcing its consumer protection laws and ensuring fair business practices within its borders favors keeping this case in California.

Moreover, transferring this case would inequitably shift the burden from Epic to CureIS, who properly selected this forum based on the location of the affected customers and the harm suffered, and would create "unnecessary duplication of judicial resources." *Cf. Helm v. Alderwoods Grp., Inc.*, 2008 WL 2915424, at *4 (N.D. Cal. July 22, 2008) (denying motion to transfer on this basis). The equities do not support rewarding Epic's wrongful conduct by allowing it to escape the jurisdiction where its actions caused the majority of the claimed harm. The balance of equities thus strongly favors CureIS, and transfer of venue would be contrary to the interests of justice.

## CONCLUSION

For the foregoing reasons, Epic's motion to transfer venue should be denied.

DATE: July 1, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By /s/Adam B. Wolfson
Adam B. Wolfson
*Attorneys for Plaintiff*