QUINN EMANUEL URQUHART & SULLIVAN, LLP
Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
Ryan S. Landes (Bar No. 252642)
  ryanlandes@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

  Paulina Slagter (Bar No. 318559)
  paulinaslagter@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone:     (650) 801 5000
Facsimile:     (650) 801 5100

*Attorneys for Plaintiff CureIS Healthcare, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CureIS Healthcare, Inc., | Case No. 3:25-cv-04108-MMC |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| vs. | **CLAIMS FOR RELIEF:** |
| Epic Systems Corporation, | 1. **VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1) EXCLUSIVE DEALING** |
| Defendant. | 2. **VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2) ATTEMPTED MONOPOLIZATION** |
| | 3. **VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2) MONOPOLY MAINTENANCE** |
| | 4. **TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS** |
| | 5. **TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
| | 6. **TRADE LIBEL** |
| | 7. **LANHAM ACT** |
| | 8. **UNFAIR COMPETITION (CAL. BUS. PROF. CODE § 17200,** *et seq.***)** |
| | 9. **FALSE ADVERTISING (CAL. BUS. PROF. CODE § 17500,** *et seq.***)** |
| | **JURY TRIAL DEMANDED** |
| | Trial Date:     None Set |

CureIS Healthcare, Inc. ("CureIS"), by its undersigned counsel, hereby brings this action against Defendant Epic Systems Corporation ("Epic") and alleges as follows:

## PRELIMINARY STATEMENT

1.     In 2006, several healthcare industry veterans founded CureIS, with the mission of improving healthcare through information technology. The U.S. healthcare industry had long been plagued by inefficiencies and added costs stemming from antiquated systems that did not interoperate with each other and did not reflect the latest in technological progress. CureIS sought to help remedy that problem through a variety of software products. Today, it offers a suite of different options that automate, streamline, and optimize complex healthcare operations, including enrollment, claims adjudication, revenue cycle management, compliance, and data management to healthcare providers, Payers (*i.e.*, health insurers), and research organizations. In particular, CureIS specializes in technologies that enable managed services for government-managed programs like Medicare, Medicaid, and state healthcare initiatives—historically underserved portions of the overall industry.

2.     Defendant Epic is also a company that first sought to improve healthcare through technological innovation, but has since lost the thread of that goal in favor of focusing ever more on growth, no matter the cost. Today, Epic is the dominant provider of electronic health record ("EHR") software in the nation. The vast majority of health providers today have switched to EHR from traditional paper records, giving Epic immense power throughout the entire healthcare industry. Current estimates are that between 8 and 9 out of every 10 people in the U.S. have at least one Epic EHR in their medical records, meaning that the only way to see the patient's full medical history is to obtain records from Epic. This means that nearly every player in the healthcare industry must be able to interact with Epic's EHR software in some way.

3.     Epic also provides a Core Administrative Processing System ("CAPS") to the vast majority of payer-sponsored health plans in the United States, via its Tapestry product. At a high level, core administrative processing systems are software systems used by health plans, MCOs, and other payers to determine whether a submitted healthcare claim should be approved, denied, partially paid, or flagged for further review. These platforms automate the end-to-end lifecycle of

claims processing, from intake through adjudication, payment, and reporting. Providers enter medical information into their EHR system that is used to generate invoices from their billing systems (for Epic, the provider billing system is called Resolute), which is then ingested into payers' CAPS (*i.e.*, Tapestry). The problem, however, is that providers' EHR-generated data is often incomplete, incorrect, or formatted in a manner that cannot be read or utilized by the receiving payers' CAPS. To solve this problem, a new category of software has arisen in the space between EHR and CAPS software: Managed Care Middleware ("MCM").

4.    MCM software, which is agnostic as to providers' EHR software or payers' CAPS software, translates billing and encounters data from a provider's EHR software into a format that can be properly validated and analyzed within a payer's CAPS software. This greatly improves a managed care organization's business flow, leading to greater efficiencies, lower costs, and corresponding benefits to patients. It also better allows both EHR and CAPS software users to switch between systems, if they want. CureIS has been at the forefront of the MCM industry for nearly two decades.

5.    Notably, by law, EHR and CAPS software providers like Epic ***must*** allow access to the free flow of electronic health information ("EHI") stored by their systems, and ***must*** allow— and, indeed, facilitate—interoperability with those systems so that third parties, like CureIS, can provide services to customers wishing to utilize that EHI for their everyday business. This is mandated by the federal 21st Century Cures Act ("Cures Act") and reflects Congress's determination that, in order to reduce healthcare costs and improve the healthcare system overall, it is against federal law and policy to create EHI bottlenecks and other impediments to efficient use of such information by anyone in the healthcare industry authorized to use the information.

6.    For the vast majority of its corporate life, CureIS had no issues with Epic or any other EHR or CAPS provider (and still has no issues with other EHR or CAPS providers besides Epic). CureIS grew its business by providing high quality products to customers needing its software solutions—most often, third-party payers (*i.e.*, health insurers)—and, in doing so, helped improve healthcare for those most in need throughout the country. However, that changed when it became clear that what CureIS had once thought were one-off instances of friction with Epic were in fact

part of a widespread scheme by Epic to improperly interfere with CureIS's business, as well as that of other providers of MCM software, in violation of the Cures Act.

7.     Epic did so through a variety of acts. For example, Epic recently imposed an "Epic-first Policy," whereby any entity utilizing Epic's EHR or CAPS software must use Epic's versions of other products, if it has a version of the product in question. But Epic also insists that its EHR or CAPS customers not use products like MCM software, **even if** Epic does not have a functioning or equivalent-in-quality version of that software. It will typically do so by first misrepresenting to customers that it either has plans to roll out a version of a competitor's product soon, or that Epic has a current product that replicates the functionality of a competitor's product, even though Epic's products are typically of much lower quality. But these representations are false and, in any event, even if a customer wants to use a third party's MCM software (like CureIS's software), Epic will not allow them to do so. These tactics prevent Epic's EHR and CAPS customers from utilizing third parties' products in general, regardless of their preference.

8.     This is not the extent of Epic's wrongful conduct. Among other things, Epic has targeted CureIS specifically by coercing mutual customers to terminate their relationships with CureIS, denying CureIS's customers access to their own data for the purpose of harming CureIS, degrading the quality of CureIS products to stifle competition, falsely disparaging CureIS to CureIS's current and prospective customers, and engaging in widespread false advertising. CureIS is capable and happy to compete on a level playing field, because it offers superior products and service. But Epic has chosen to compete unfairly using illegal tactics, to the detriment of CureIS and patients nationwide.

9.     The "why" behind Epic's misconduct is clear. Epic is nearing the saturation point in EHR software and needs to identify new areas for growth. On the back of its EHR dominance, Epic has grown into a company reportedly worth more than $45 billion. But that is not enough for Epic, because the healthcare industry is large and involves multiple different product markets. In this particular case, payer administration platforms or CAPS more broadly—and provider-sponsored health plan CAPS software, specifically—is an area where Epic is growing extremely fast and, if left unchecked, will soon dominate in the exact same way it dominates EHR software. By wielding

its power to destroy healthcare technology innovators—particularly those in the MCM software space, like CureIS—Epic is feeding its need for more and more cash so that it can obtain monopoly power in yet another market, even if it means depriving those in the most need of the best possible options for healthcare services.  This stranglehold enables Epic to eliminate perceived competitors and insulate itself from market-driven incentives to improve or innovate its own products, permanently lowering the bar for everyone. The cycle of stagnation caused by Epic's unfair and illegal conduct hits managed care organizations particularly hard, because they must make do with the least resources, but are still forced by Epic to pay bloated fees in exchange for mediocrity and ineptitude from Epic's products and services.[1]

10.    CureIS cannot allow that rapacious conduct to continue, and therefore brings this lawsuit to stop Epic from engaging in further wrongful behavior. Epic's ongoing actions constitute anticompetitive, tortious, unfair, and unlawful conduct, and have injured CureIS by depriving it of customers, revenue, and market opportunities.  And it has injured the market and the public at large by depriving them of products, services, and prices that would result from fair and honest competition.  Epic's conduct must be stopped and it must compensate CureIS for the harm it has caused.

## THE PARTIES

### A.    Plaintiff

11.    Plaintiff CureIS Healthcare, Inc. is a privately held corporation organized and existing under the laws of Minnesota, with principal places of business at 670 Commerce Drive, Suite 200, Woodbury, Minnesota 55125 and 1640 East River Road, Suite 208 Tucson, AZ 85718.

### B.    Defendant

12.    Defendant Epic Systems Corporation ("Epic") is a privately held corporation organized and existing under the laws of the State of Wisconsin with its principal place of business

---

[1]    A managed care organization ("MCO") is a health insurance plan that contracts with healthcare providers and medical facilities to provide care at reduced costs. MCOs emphasize cost-efficiency, preventive care, and coordination of services. Common types include HMOs, PPOs, and POSs.

1  at 1979 Milky Way, Verona, Wisconsin 53593. Epic operates nationwide and conducts substantial

2  business in the Northern District of California.

3  <center>**JURISDICTION AND VENUE**</center>

4      13.    This Court has personal jurisdiction over Epic pursuant to Federal Rule of Civil

5  Procedure 4(h)(1)(A) and the California long-arm statute because (a) Epic transacts substantial

6  business in this District; and (b) Epic directed the tortious, and otherwise illegal conduct from which

7  these claims arise toward this district, where CureIS's customer, ███████████, resides.

8      14.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because

9  the amount in controversy exceeds $75,000 and this action is between citizens of different

10  jurisdictions. Epic is a citizen of Wisconsin. CureIS is a citizen of Minnesota and Arizona.

11      15.    This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1337 and 1331, as

12  this action arises in part under the Sherman Act, 15 U.S.C. §§ 1, 2 and the Lanham Act, 15 U.S.C.

13  § 1125(a).

14      16.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Epic is an entity subject to

15  this Court's jurisdiction and a substantial part of the events or omissions giving rise to the claims

16  and affecting interstate commerce occurred in this judicial District, where CureIS's customer, ███

17  █████, resides.

18  <center>**FACTUAL ALLEGATIONS**</center>

19      17.    Healthcare in the U.S. has historically operated on a fee-for-service payment model.

20  Under a fee-for-service model, healthcare providers are paid for each service they provide, and are

21  accordingly rewarded for the volume of services, as opposed to the results. Over the last 20 years,

22  there has been a growing concern that fee-for-service healthcare in the U.S. contributes to rising

23  healthcare costs. Healthcare in the U.S. costs significantly more per capita than it does in other

24  countries. As of 2023, the cost of healthcare in the U.S. was about $12,555 per capita, whereas the

25  comparable average in other developed countries was just $6,651. In response, the federal

26  government has turned to legislation and regulation to shift the U.S. towards a value-based care

27  payment model. The Centers for Medicare & Medicaid Services ("CMS") has led this development

28  by testing several voluntary and mandatory programs with hospitals, physician groups, health plans,

and other health care entities. These programs include groups of providers referred to as accountable care organizations ("ACOs") and managed care organizations ("MCOs") serving Medicaid members. Approximately 75% of all Medicaid beneficiaries are enrolled in MCOs. MCOs receive reimbursement from the government on a risk basis, which incentivizes these providers to keep patients healthy in order to keep costs down.

18.    145 million Americans depend on some form of public health insurance (*e.g.*, Medicare, Medicaid, and CHIP). However, MCOs, especially those serving government programs like Medicare and Medicaid, have historically been underserved by healthcare technology companies due to the sector's exceptional complexity, regulatory burdens, and frequent changes. Most mainstream healthcare IT vendors focus on larger, more profitable segments, leaving MCOs to rely on outdated systems and manual workarounds. These MCOs therefore face constant challenges such as maintaining compliance with evolving regulations, ensuring data integrity across disparate sources, and managing intricate enrollment, claims, and reimbursement processes. The lack of tailored, automated solutions has led to inefficiencies, increased operational costs, and heightened risk of penalties or sanctions for non-compliance. All of this prevents MCOs from delivering high-quality, cost-effective care.

19.    CureIS recognized this gap and developed technology and managed services specifically for government managed care programs. Unlike generic, off-the-shelf software that struggles to adapt to the specialized workflows and compliance requirements of MCOs, CureIS's solutions are specifically designed to automate and optimize every aspect of managed care operations from enrollment and eligibility determination to claims adjudication and advanced analytics. Unlike products designed for providers, CureIS designs products to respond to the unique and important needs of organizations financially responsible for this care.

20.    Today, CureIS offers, among other things: (a) optimization and automation of claims adjudication, (b) enrollment and eligibility management, (c) revenue cycle tools, (d) encounters reporting and government compliance services, and (d) data scrubbing and analytics. These are products in the Managed Care Middleware market, the definition and boundaries of which are discussed in further detail below. In order to understand what these products do and how they fit

CUREIS'S FIRST AMENDED COMPLAINT

into the healthcare industry—and to understand Epic's role in all of this—CureIS first provides background on the various products (and product markets) at issue in this dispute.

> **A.    Electronic Health Records (EHR): The Source of Epic's Wide-Ranging Power in the Healthcare Industry**

21.    Epic's core product is a proprietary electronic health record software ("EHR software") platform. An Electronic Health Record ("EHR") is an electronic version of a patient's medical history that may include some or all of the key administrative clinical data relevant to that person's care.  For the reasons discussed below, EHR software is a relevant antitrust market.

22.    EHR software allows healthcare providers to add, update, maintain, and delete patient EHR data. EHR software also facilitates the storage, management, and dissemination of EHR data. Most EHR software also enables providers to manage clinical workflows, billing, scheduling, and other administrative operations required for the provision of healthcare.

23.    Customers of EHR software exhibit unique pricing sensitivities and demand characteristics compared to users of other types of software. EHR software has tremendous upfront costs. Epic's onboarding and implementation typically costs, on average, about $700 million. IT personnel at Epic's customers are required to undergo months and years of certifications for each Epic module, including in-person trainings and in-person proctored exams, which they must pass to use Epic's software.

24.    There are no reasonably interchangeable substitutes for EHR software. EHR software must comply with stringent regulations like HIPAA and HITECH, which are frequently updated. These requirements demand significant investment in security, privacy, and documentation. Additionally, switching EHR Systems (or switching to non-electronic health records systems) can disrupt providers' operations and delivery of care and require retraining, risking data loss or reduced productivity.

25.    As a result, a hypothetical monopolist of EHR software could profitably impose a small but significant non-transitory increase in price ("SSNIP") or degradation in product quality because EHR software users would not switch to alternative products in sufficient numbers to render the price increase or product degradation unprofitable.

26.    The geographic scope of the EHR software market is limited to the United States. All relevant participants in the healthcare market, including health insurers and Payers, are based within the U.S., and EHR software is specifically designed to comply with U.S. regulations.

27.    Epic manages more than 325 million patient records, with at least $813 billion in healthcare expenditures processed through Epic in 2023. Epic generates approximately $5 billion in revenue annually. Over 60% of health systems and academic medical systems use Epic EHR software, including every health system on U.S. News & World Report's best hospitals list. And over 90% of the country's medical students train on Epic's EHR software systems. In the U.S., somewhere between 81-94% of patients have at least one medical record stored in an Epic EHR software system. As a result, retrieving almost any patient's full medical history requires interacting with Epic in some manner.

28.    Epic also has a durable monopoly. Epic gained 79% of new hospital EHR deals between 2017 and 2022, while no other competitors made even a net gain of beds during that same period.[2] Epic's only large competitor in the EHR software market, Cerner, continues to lose hospital clients to Epic. While Epic grew its market share by approximately 8% between 2020 and 2023, Cerner's market share declined by approximately 3% during the same period.[3]

29.    Epic's market power is reinforced by overwhelming lock-in effects of its EHR software. Epic installation involves sums of nine- or ten-figure investments, with over two-thirds of this cost attributable to upfront fees alone.[4] Because transitioning to Epic's EHR software can take many months to several years to fully complete, healthcare organizations are virtually prohibited from switching EHR software vendors after moving to Epic. As one source described, "Epic knows switching costs are too high to move to another vendor, as there are large-scale losses in

---

[2]    Seth Joseph, Epic's Antitrust Paradox: Who Should Control the Levers of Healthcare Innovation?, Forbes (Feb. 26, 2024), https://www.forbes.com/sites/sethjoseph/2024/02/26/epics-antitrust-paradox-who-should-control-the-levers-of-healthcare-innovation/.

[3]    Rohan Kulkarni, Oracle Must Stop Kicking the Cerner Can Down the Road—It's Time to Get Decisive, HFS Research (Jan. 14, 2025), https://www.hfsresearch.com/research/oracle-kicking-cerner-decisive.

[4]    *Implications of an emerging EHR monoculture for hospitals and healthcare systems*, Ross Koppel and Christoph Lehmann, Journal of the American Medical Informatics Association Vol. 22, Issue 2 (March 2015), https://academic.oup.com/jamia/article/22/2/465/695841.

1    productivity, time spent, and resources in changing behavior and moving to a computerized EHR

2    system in the first place."[5]

3        30.    In addition to the lock-in effects and high switching costs, potential competitors in

4    the EHR software market face other significant barriers to entry. First, developing EHR software

5    demands substantial investment and specialized technical expertise to meet the stringent compliance

6    requirements of the highly regulated healthcare industry. Second, incumbents benefit from powerful

7    network effects, where the scale achieved by an existing EHR software provider (*e.g.*, Epic) creates

8    a formidable barrier to entry. As more hospital and provider customers join Epic's EHR, the value

9    of Epic's EHR increases in step with the need for Epic interoperability.

10        31.    Epic's monopoly over EHR software and patient data, combined with predatory

11    tactics and unfair competition, has entrenched its dominance in that market while harming

12    competitors, innovation, and thereby harming consumers and increasing healthcare costs.

13        **B.    Epic's Tapestry: Dominating CAPS for Provider-Sponsored Health Plans**

14        32.    In addition to dominating EHR software, Epic also is currently the largest player in

15    the U.S. market for Core Administrative Processing Systems ("CAPS") for provider-sponsored

16    health plans ("PSHPs"), which allow healthcare payers to evaluate and process healthcare claims.

17    It is distinct from other types of billing operations management software outside the healthcare space

18    because of the unique needs and requirements for their billing operations, which are governed by a

19    variety of federal and state laws. CAPS software is also distinct from EHR software because the two

20    categories have different purposes and uses, as well as different customer bases. Whereas EHR

21    software generates and stores medical records and bills, CAPS software is used to properly process

22    those bills by applying contractual terms, coverage rules, and regulatory standards to determine what

23    should be paid, denied, or flagged. Whereas the customer base for EHR software is made up of

24    hospitals and other healthcare providers who need to generate medical records, the customer base

25

26

27

28
    ───────────────
        [5]  *Epic EHR Systems: The Role of Network Effects*, Harvard Business School,
    https://digital.hbs.edu/platform-digit/submission/epic-ehr-systems-the-role-of-network-effects/.

for CAPS software is made up of the payers of that healthcare.[6] Put simply, EHR and CAPS software have different purposes and a user of one would not switch to the other at all if the price for the software the customer was using went up substantially (or the functionality substantially deteriorated). For these reasons, it is unsurprising that industry analysts recognize CAPS software as its own product market.[7]

33.    Within CAPS software generally, however, a narrower product market exists for CAPS software for PSHPs. CAPS software for PSHPs is a specialized form of CAPS software tailored to the specific needs of PSHPs which have unique administrative requirements as risk-bearing provider organizations, which own and operate their own insurance plans and need specialized CAPS software to integrate clinical and administrative data, streamline operations, and support value-based care models. For example, many of the reporting requirements imposed on PSHPs are not required for other healthcare organizations (including other payers), and those reports are required to be prepared in specific file formats. This is due to stringent rules and regulations at the federal and state levels, including HIPAA, HITECH, the No Surprises Act, Centers for Medicare & Medicaid ("CMS") Guidelines, and the Council for Affordable Quality Healthcare's (CAQH) Committee on Operating Rules for Information Exchange (CORE) operating rules. These requirements demand a significant investment in security, privacy, documentation, and compliance. CAPS software for PSHPs must also account for delegated risk arrangements and capitation carve-outs, requiring complex logic to split financial responsibility between payers and provider entities. PSHPs are unique from other managed care organizations insofar as they integrate insurance and care delivery and unlike other payers or providers, PSHPs assume both clinical and financial risk. As such, CAPS software for PSHPs requires robust data integration to identify care gaps and support

---

[6]    There is a hybrid category of payer called a "pay-vider" that both provides healthcare and pays for that and other healthcare. Pay-viders will use EHR software for the provider side of their business (or work with entities that utilize EHR software for that purpose), and CAPS software for the payer side of their business.

[7]    Revenue Cycle Management Market Size, Share & Trends Analysis Report by Product (Software, Services), by Type (Integrated, Standalone), by Delivery Mode, by End Use, by Region, and Segment Forecasts, 2025–2030, Grand View Research (May 2025), https://www.grandviewresearch.com/industry-analysis/revenue-cycle-management-rcm-market

value-based care models. Due to the administrative complexity of CAPS software for PSHPs, these specialized workflows are not supported by generalized adjudication platforms. The cost and complexity of tailoring a general platform to these requirements render substitution infeasible for most PSHPs. CAPS software products for PSHPs must also mold EHR and billing data into highly specific file formats, particularly for any information provided to government entities, such that switching can disrupt payers' operations and demand large labor commitments to remedy errors in claim adjudication workflows. Indeed, Epic itself has recognized the distinct market for CAPS software designed for PSHPs, stating in its Tapestry documentation that it is a separate "managed care product" for "use by our organizations that provide a health plan for their patients."[8] PSHPs have unique and specialized CAPS software and PSHPs exhibit unique pricing sensitivities and demand characteristics compared to users of other types of CAPS software. Consequently, a hypothetical monopolist of PSHP CAPS software could impose a SSNIP or reduce the quality of its CAPS software without losing sufficient customers to alternative products (due to high switching costs) to make raising prices above competitive levels or offering sub-optimal products unprofitable. Users of Epic's CAPS software, Tapestry, face high switching costs because these platforms are deeply embedded in providers' billing and administrative operations, making transition disruptive and expensive. Migrating to a new CAPS system requires substantial investment in data conversion, staff retraining, and process reengineering, creating significant financial and operational barriers. However, as discussed below, MCM software substantially reduces several of these switching costs.

34.    The geographic scope of the CAPS software market is limited to the United States. All relevant participants in CAPS software market are based within the U.S. because CAPS solutions must be tailored to the unique and complex regulatory, reimbursement, and payer systems that are specific to U.S. healthcare, including specific coding standards, claims submissions

---

[8] Managed Care, Epic Systems Corporation, https://open.epic.com/Financial/ManagedCare ("Managed Care. Epic provides a managed care product - Tapestry - for use by our organizations that provide a health plan for their patients. Their managed population may also be seen outside of their organization. These interfaces are specifically used when Epic's managed care software is in use.").

1    protocols, and evolving reimbursement guidelines. Solutions developed for other regions are not

2    reasonable substitutes for U.S.-focused CAPS software.

3        35.    Industry reports recognize Epic as a "Key Compan[y]" in the broader CAPS software

4    market.[9] Epic's PSHP CAPS software product, Tapestry, has market share that some estimates put

5    as high as 76%.[10] Epic's Tapestry market share continues to grow. Tapestry's competitors include

6    Cognizant Facets & QNXT, HealthEdge Health Rules Payer, Plexis, and Oracle IDX FRM.[11] This

7    explains why Tapestry's market share continues to grow in the PSHPs CAPS software market, as

8    Tapestry's functionality is specifically tailored to the needs of PSHPs.

9        **C.    Managed Care Middleware: Breaking Silos, Unlocking Competition**

10        36.    CureIS operates in a distinct and essential segment of the managed care ecosystem:

11    the managed care middleware market. MCM software serves risk-bearing entities such as

12    Independent Physician Associations ("IPAs"), Medicare Advantage Organizations ("MAOs"),

13    Accountable Care Organizations ("ACOs"), and other MCOs. These organizations bear financial

14    risk for patient populations and require sophisticated tools to reconcile clinical, claims, and quality

15    data across disparate systems. MCM software therefore provides functionality that both providers'

16    EHR and payers' CAPS software does not, including risk analytics, data scrubbing and validation,

17    compliance management, and care coordination.

18        37.    MCM software sits between EHR software and CAPS software. It functions as

19    middleware—an orchestration and translation layer—bringing together data from multiple sources,

20    including, for example, EHRs, claims feeds, labs, and social determinants of health ("SDOH").

---

9    *Revenue Cycle Management Market Size, Share & Trends*, Grand View Research,
https://www.grandviewresearch.com/industry-analysis/revenue-cycle-management-rcm-market.
10    There are a total of 282 Medicaid MCOs in the United States. *See* "Total Medicaid
MCOs," Kaiser Family Foundation State Health Facts (last visited July 10, 2025),
https://www.kff.org/medicaid/state-indicator/total-medicaid-mcos/.  Online sources indicate that
Epic's CAPS software product for Managed Care Organizations, Tapestry, has 196 customers. *See*
"Epic Tapestry," Enlyft (last visited July 10, 2025), https://enlyft.com/tech/products/epic-tapestry.
11    For example, AthenaIDX describes its CAPS software as a "solution that guides health
systems, hospitals, large ambulatory groups, and Billing Services to optimize financial
performance and successfully adapt to healthcare payment reform." athenaIDX Datasheet,
Athenahealth, Inc., https://www.athenahealth.com/sites/default/files/media_docs/athenaIDX%
20Datasheet.pdf. (last visited July 14, 2025).

1    MCM software then normalizes and harmonizes this data, enabling actionable workflows to support

2    care gap closures, compliance with CMS performance metrics (such as STARS and HEDIS), and

3    better coordination between providers and payers. MCM tools are neutral and vendor-agnostic,

4    making them indispensable to the effective administration of value-based care and also effective as

5    a middleware layer enhancing interoperability and making it possible to switch between different

6    data formats and software systems (*e.g.*, different EHR and CAPS software providers).

7         38.    MCM software—and, in particular, CureIS's products—are uniquely tailored for

8    managed care by ensuring MCOs have accurate and up-to-date data that complies with the

9    constantly changing, countless sets of rules and regulations applicable to them. This includes

10   ensuring accuracy of and compliance with member enrollment and eligibility information, claims

11   encounter information submitted to government entities, or bills sent to members or payments to

12   providers. MCM software functions as middleware in the managed care value chain, which provides

13   the infrastructure and logic to enable value based care, including: (a) aggregating data from multiple

14   EHRs, claim sources, labs, and SDOHs, (b) normalizing and interpreting clinical claims data for

15   population level analysis, (c) delivering workflows and reports to close care gaps, (d) optimizing

16   CMS performance, and (e) supporting coordination between providers' interaction-level raw data

17   and a payers' CAPS software.

18        39.    CureIS's MCM software products include EnrollmentCURE, EncounterCURE,

19   RecoveryCURE, and LettersCURE (discussed further below). This software provides unique

20   functionality that MCOs cannot replicate using just EHR or CAPS software alone.  MCM software

21   is unique in that it enables MCOs to access clinical and billing data, automate payer-facing

22   processes, and support compliance with regulatory and contractual requirements. They do so by

23   scrubbing, re-formatting, and reconciling various data sources to transform error-prone, opaque, and

24   unusable data into portable, fully interoperable, readable, and analyzable data optimized for each

25   customer's particular needs.

26        40.    What is apparently most concerning for Epic in the competitive sense is that MCM

27   software also empowers customers to independently manage their own data, such as the information

28   they generate through use of EHR and/or CAPS software. MCM software thus provides MCO

customers a tool by which to disintermediate their own systems and data from Epic's control of patient and billing data. By doing so, MCM software makes billing (EHR) and claims processing (CAPS) software solutions less "sticky" (*i.e.*, reduces switching costs between EHR and CAPS software solutions) and therefore requires provider billing (EHR) and payer CAPS software providers to compete more with each other as a result.

41.     Critically, MCM software relies on an MCO's ability to feed EHR and CAPS data into the MCM software. MCO customers feed this data into their MCM software, which then applies ever-changing business logic and rules to the data to perform advanced data reconciliation across disparate sources, verify data accuracy through cross-referencing with other records, identify and close information gaps, or apply dynamic, customized business logic to automate complex manual workflows on a continuous basis. Cleaning, scrubbing, validating, and reconciling disparate data sources ensures payers are not incorrectly or inaccurately billing for members' care. Epic's products do not perform these functions.[12]

42.     Prior to the development of MCM software, payers required large teams of billers to remedy errors in EHR and CAPS data, manually input member information, and review claim denials for data quality or compliance issues and fix repeat errors over and over again. But with MCM software, payers can now drastically reduce the number of errors generated by EHR software and received by CAPS software (and vice versa), and accordingly can drastically reduce the amount of manual intervention required by billers. Accordingly, MCM software costs much less than traditional manual billing services and has unique demand from such traditional services as a result. It also dramatically improves MCOs' business flow, thereby improving coverage outcomes for plan participants and improving healthcare overall.

43.     As a result of the unique demand MCM software generates, there are no reasonably interchangeable substitutes. CAPS software does not provide comparable functionality, and

---

[12]   For example, MCM software may review those enrollment records on a daily basis and determine whether or not the enrollment information in a Payer's CAPS software platform is up-to-date. To illustrate, if a member drops out of the health plan and seeks care the next day, MCM software would ensure that the Payer does not inadvertently treat that member as covered under the health plan. CAPS software, by itself, does not include that functionality.

customers recognize that CAPS software is not a substitute for MCM software. Indeed, the only customers for MCM software are MCOs that *already have* CAPS software, indicating that MCM software is complementary to—not interchangeable with—CAPS software. Because of this and the other facts cited above, a hypothetical monopolist of MCM software can profitably implement a SSNIP or product degradation because MCM software customers would not switch to other types of products—*e.g.*, CAPS software alone, or expensive and slow manual contract biller services—in sufficient numbers to make the SSNIP or degradation in product quality unprofitable.

44.    The geographic scope of the MCM market is the United States. The United States, at both the federal and state level, has a unique regulatory scheme that controls how payers operate and run their business. Furthermore, payers are United States citizens and residents, and are therefore located within the United States. Providers of MCM software are also located within the United States.

45.    CureIS was one of the first in the nation to provide MCM software and, historically, the only other competitive products of which it was aware were in-house software developed on an *ad hoc* basis by payers' IT teams. However, a growing number of healthcare IT companies are developing products in the MCM software space. Some of these competitors include DataWing (acquired by Citra Health Solutions), Edifecs (recently acquired by Cotivi), and Gaine. While Epic claims to compete with CureIS's MCM software products, Epic's products do not offer the MCM software functionality and to the extent they provide functionality reminiscent of MCM software, they are extremely limited and starkly inferior to real MCM software offerings, as reported by CureIS's customers.  Epic's products also thwart interoperability (by design). Epic's false claims to provide MCM software aside, Epic has indicated that it plans to enter the market in the near future (discussed further below).

## CUREIS'S PRODUCTS

46.    As briefly discussed above, unlike larger, less technically sophisticated competitors, CureIS was founded to address the chronic problems of manual data handling, error-prone legacy processes, and regulatory complexity that most vendors avoid due to the sector's demanding requirements. What sets CureIS apart is its Managed Care Master Data Model, which routinely and

1  proactively updates its products through a complex web of automated business logic rules. CureIS

2  on average makes a change to these logic rules every 24 hours. These changes can be the result of a

3  file format change put in place by a trading partner (*e.g.*, an insurance carrier), or based on a

4  suggestion from a customer seeking to make its billing processes more efficient. These logic rule

5  changes are then reviewed by CureIS personnel and tested rigorously before being implemented at

6  any given customer.

7      47.    Because CureIS is a nimble solution, unlike the underlying clunky CAPS or EHR

8  billing software, CureIS is able to turn around these changes very quickly—often the same day that

9  those changes are flagged. Further, CureIS does not charge customers for these changes. Instead,

10  they are a key feature of CureIS's solutions that customers see as a core value that Epic's Tapestry

11  product does not provide.

12      48.    CureIS offers several types of MCM software. These include:

13      **(a) *EnrollmentCURE*.** EnrollmentCURE is CureIS's oldest and most popular product.

14  EnrollmentCURE was developed in the first instance for ████████████. The product verifies

15  the enrollment information of all members in a customer's system to ensure that all of the

16  information is accurate. It also ensures members are aligned with the proper primary care providers,

17  and that those primary care providers have accurate information regarding each member's

18  enrollment. This information changes frequently and unexpectedly as members roll on and off

19  health plans or change their addresses, for example. Unlike traditional enrollment functions offered

20  by legacy systems, such as Tapestry, EnrollmentCURE checks for updates to member information

21  in real time so that any claims associated with those members are not erroneously denied.

22      **(b) *EncounterCURE*.** EncounterCURE is tailored primarily to government programs.

23  Medicare and many Medicaid programs require health plans to submit files commonly referred to

24  as "encounters" pursuant to their reporting requirements, such as 42 CFR § 438.602(e), which

25  requires periodic audits of encounter data. These encounters are similar to claims in that they detail

26  information about the patient's care. In managed care plans, encounter data is crucial for monitoring

27  the performance of health plans and whether or not health plans are adhering to regulatory

28  requirements. If the information contained in these encounter files is incorrect, it can result in

payment denials or even sanctions by government entities.  EncounterCURE uses a proprietary set of rules and cleaning functions to drastically reduce the amount of incorrect information in encounter files submitted to receive payment from state and federal agencies.

(c) *RecoveryCURE*. RecoveryCURE helps customers recover payments for members that are on managed care plans but are subject to payment carveouts or contracts that divide financial responsibility for the member among multiple parties.  In these situations, the customer health plan has typically already paid for the member's care and has to identify the correct party to seek reimbursement from.  For these members, RecoveryCURE uses proprietary business rules to prepare claims to recover the lost revenue, and it also tracks payments or disputes regarding claims for recovery.

(d) *LettersCURE*. LettersCURE manages correspondence templates and generates correspondence to Payer plan members regarding their benefits. These letters may provide notices regarding, for example, pre-authorization, coverage denials, or claim appeals. The letters are generated based on information contained within CAPS software platforms. While many CAPS software platforms contain a basic template for letter generation, these templates need to be manually checked, printed, and mailed by Payers. LettersCURE automates the generation of letters with specific information required under regulations, attaches an image of the claim, and automatically sends those letters to a printer.

49.    CureIS developed its products to sit between and work in conjunction with providers' EHR billing systems like Epic's Resolute, and payers' claims processing software, or CAPS, like Epic's Tapestry.  However, as detailed below, Epic has systematically denied CureIS access to CureIS's current and prospective customers' EHI and billing data, making it impossible for CureIS to provide these much-needed services.  And for many of these customers, Epic has fraudulently claimed it can provide the same services CureIS provides, when in fact it is unable to do so.

## EPIC'S MULTI-PRONG SCHEME TO DESTROY CUREIS'S BUSINESS SPECIFICALLY, AND MCM SOFTWARE BROADLY

50.    Although Epic continues to gain market share in the EHR software market, in order for the estimated $45 billion company to continue its growth and dominance of the healthcare

industry, it must look to other markets than those which originally gave it so much power, and—at least, in Epic's eyes—it must prevent any roadblocks to dominating those additional, profitable markets. One such market is PSHP CAPS software, in which Epic has obtained an approximately 70% share to date. Middleware-type products like MCM software reduce CAPS software customers' switching costs, which reduces Epic's ability to impose on CAPS software customers the same sort of monopoly rents and other monopolist-based requirements that it imposes in, for example, the EHR software market. Epic therefore has a powerful incentive to prevent the proliferation of MCM software and to eliminate the strongest competitors in that space; in particular, CureIS. CureIS has operated in the MCM software market for more than a decade and is well-known to those who utilize such software solutions. Accordingly, Epic has trained its sights on CureIS in particular as an impediment to Epic's designs to dominate CAPS software (and, MCM, by extension).

51.    At a certain point, Epic decided that, in its own words, CureIS was "a direct competitor" with "Tapestry Enrollment and Eligibility functionality." As described below, Epic then set about a strategy to stonewall, disparage, and attempt to copy CureIS's products by: (a) intentionally interfering with CureIS's customer relationships by pressuring or coercing existing customers and business partners not to work with CureIS, (b) cutting off and blocking data access to CureIS's current customers and preventing the onboarding of new customers, (c) disseminating false or misleading information about CureIS's and Epic's products, and (d) imposing an "Epic-first Policy"—an exclusive dealing that has no legitimate business justification. The following representative examples are those of which CureIS is currently aware, but Epic's behavior reflects a broader scheme aimed at impacting CureIS's relations with many other current and prospective customers.

### A.    Epic's Intentional Interference with CureIS's Customer Relationships, Blocking Data Access, and Reducing the Quality of CureIS's Products

52.    After becoming aware of CureIS's strength in Managed Care, Epic implemented a multi-prong scheme to undermine CureIS's relationships with existing customers.  CureIS's recent investigation has revealed that Epic knowingly and wrongfully interfered with CureIS's contracts

1   with ███████████████████████, and ███████████, in addition to unlawfully
2   blocking customers from accessing their own data for the purpose of reducing the efficacy of
3   CureIS's products.

4            **1.** ███████████████████████████

5        53.  ███████████████████████████ are two of CureIS's oldest
6   customers. CureIS originally developed the first version of EnrollmentCURE for ████ in 2012. In
7   2017, ██████ expanded its relationship with CureIS by entering a licensing agreement for
8   EncounterCURE. When ██████ began migrating its EHR software and CAPS software platforms to
9   Epic in 2022, ██████ asked CureIS to help manage the transition from IDX to Epic integration and
10  CureIS agreed to do so.

11       54.  But as Epic has started the process of replacing IDX at ███████████ has reduced
12  CureIS's product integrations with ██████ and the volume of its business, and has ceased processing
13  new members, all in anticipation of a full integration with Epic. █████████████ Vice President
14  of Revenue Cycle Management & Enterprise Resource Planning Systems, ████████████,
15  informed Chris Sawotin, CureIS's CEO, that ████████████ would continue to use
16  EncounterCURE after the integration, but would stop using EnrollmentCURE once the integration
17  was complete.

18       55.  ████████████ told Mr. Sawotin that ████████████ would have no need for both
19  EnrollmentCURE and EncounterCURE after the system switch was complete because Epic
20  represented to ██████ that it would provide those services instead. ████████████ went live on
21  Epic on March 1, 2024. ██████ has not entirely stopped using EnrollmentCURE, but has indicated
22  that it is planning to terminate its EnrollmentCURE contract with CureIS any day now (*i.e.*, once it
23  fully integrates with Epic)—even though none of Epic's current products provide the functionality
24  of CureIS's EnrollmentCURE or EncounterCURE products.

25       56.  At the moment, ████████████ is no longer paying for EnrollmentCURE, and
26  EncounterCURE is operating in a significantly diminished state due to Epic's ongoing obstruction.
27  Because Epic does not allow CureIS to communicate directly with its systems to receive ██████
28  EHI, EncounterCURE is being forced to work with outdated data.  CureIS needs access to its

1  customers' data for its products to function. Epic repeatedly and on an ongoing basis stonewalls

2  CureIS's access (and by extension, Epic's and CureIS's mutual customers' access) to vital EHR and

3  other data, forcing CureIS's customers to abandon integrating with CureIS's products.   Epic

4  knowingly engaged in blocking CureIS's EHI access, exchange, or use, and no regulatory exception

5  excuses this conduct.  Epic's conduct has substantially reduced the efficacy of CureIS's products.

6      57.   According to ████ its decision to discontinue its use of EnrollmentCURE was

7  induced by Epic's false promise that it could develop a replacement product. At Epic's direction,

8  ████ has stopped paying for use of EnrollmentCURE. On information and belief—based on

9  multiple prior instances in which Epic promised but failed to deliver replacement products—Epic's

10  representations to ████ were, and remain, false, and Epic knew they were false at the time it made

11  them.

12      **2.**   ████

13      58.   ████████████ is one of the largest non-profit healthcare systems in the U.S.

14  ████ serves over 3.5 million patients in Northern California and has over 57,000 employees. ████

15  operates 24 acute care hospitals and over 200 clinics.

16      59.   As one of CureIS's first clients, ████ has worked with CureIS in multiple capacities

17  for more than 18 years. CureIS developed the first version of its RecoveryCURE product for ████

18  ████████ (now a part of ████████) on ████s IDX platform. In 2010, ████ decided

19  to migrate its EHR software and CAPS software platforms to Epic.  Between 2010 and 2011, ████

20  migrated its billing and payer software from IDX to Epic and ████ hired an Epic consultant to help

21  ████ migrate the RecoveryCURE product over to the Epic system.  On information and belief,

22  during ████ migration from IDX to Epic, Epic falsely represented to ████ that CureIS's services

23  would no longer be needed once Epic was up and running.  But ████ executives understood that

24  CureIS provided value that Epic could not replace. As a result, ████ decided to keep CureIS despite

25  Epic's attempt to oust CureIS on false pretenses.

26      60.   Having failed to lure ████ by making false claims about Epic's software, Epic

27  resorted to more aggressive tactics.  After Epic went live at ████, Epic refused to provide CureIS

28  access to ████s operational data, which CureIS and ████ needed for CureIS's products to

function.  Epic delayed access to CureIS for several months before finally providing access at the urging of ████ leadership.  However, Epic limited CureIS's access to data in Epic's Clarity product.  Unlike Epic's main datastore, Epic Chronicles, the data in Clarity is not live.  Instead, the data in Clarity can be on a delay anywhere from one day to over a week and provides a more limited subset of data inputs and outputs.  CureIS products require timely data to deliver necessary services and value to customers. Despite this severe limitation on CureIS's functionality, ████ chose to continue using CureIS's products because they are far superior to Epic's (even while being choked by Epic). ████ used CureIS's products for over fifteen years until Epic escalated even further and demanded that ████ phase out EnrollmentCURE entirely.

61.    In approximately January 2025, ████ suddenly terminated its contract with CureIS for CureIS's EnrollmentCURE product, a product ████ had relied on without interruption since 2018. ████'s leadership told CureIS that they stopped using EnrollmentCURE because Epic falsely represented that Epic's Tapestry system provided the same functionality.  By March 2025, ████ was experiencing significant issues with Epic's purported replacement solution. ████ has informed CureIS that it prefers using EnrollmentCURE over Epic's solution and if Epic was not preventing CureIS's integration, ████ would start using EnrollmentCURE again because it is a superior (and entirely distinct) product.

62.    Epic's interference, which resulted in CureIS's loss of ████ business, inflicted lasting and ongoing harm, severing a longstanding and mutually beneficial relationship—a relationship from which both ████ and CureIS derived tremendous value.

63.    As a direct result of Epic's interference—including false claims about Epic's capabilities, improper blocking of integration, and coercive mandates through the "Epic-first Policy"—CureIS has lost business with at least 7 customers. Further, CureIS stands to lose additional business with any existing customer that migrates its billing system to Epic in the future, and any future customers that are already using Epic's EHR software who have been forced to adopt an "Epic-first" policy. Given Epic's power over these customers, *see supra* ¶¶ 21-35, these acts severely limit CureIS's ability to compete.

3.

64. At the end of 2023, Epic impeded ███████████████████████)—a longtime CureIS customer—from continuing its relationship with CureIS, solely because Epic viewed CureIS as its "direct competitor." Prior to Epic's interference, ██████ had happily partnered with CureIS for over 10 years.

65. In April 2012, ████████ started working with CureIS on a variety of small projects. ██████ instantly recognized the value of CureIS's solutions and, over time, ██████ and CureIS developed a strong working relationship that led to expanded collaboration and services. ██████ originally brought CureIS in to help with member enrollments when ██████ was still using IDX. ██████ had been using another vendor to validate its enrollment data, but that vendor primarily used slow and expensive offshore billers to attempt to fix enrollment data. On September 17, 2018, ██████ began using CureIS's EnrollmentCURE product.

66. After integrating with ██████ IDX platform, CureIS was able to drastically reduce the amount of time and money ██████ spent verifying member enrollments, cutting down processing time by 80%. This resulted in significant cost savings for ██████. The longer it takes Payers to verify member enrollment, the more likely it is that the newly enrolled or unenrolled member uses their plan benefits before enrollment is verified. If a member uses benefits while an enrollment change is still processing, their claims can be erroneously denied and that can result in hours of work for a biller to reprocess the claim. CureIS's solutions, including EnrollmentCURE, prevent these types of downstream issues that drive up costs in our healthcare system.

67. In 2018, ██████ decided to migrate to Epic's platform. ██████ requested that Epic collaborate with CureIS to adapt EnrollmentCURE to Epic's system. On September 18, 2018, CureIS executed a contract with ██████ to provide EnrollmentCURE. CureIS knew that ██████ was in the process of migrating from IDX to Epic. At first, Epic appeared willing to work with CureIS to allow CureIS to provide the services it promised ██████ (and that Cures Act requires). In February 2019, CureIS began working with Epic to get the data it needed for EnrollmentCURE out of Clarity, which, as mentioned above, does not have access to Epic's real-time data repository Chronicles.

68.     Epic's Workbench tool allows users to generate analytic reports from Epic's data. Workbench allows users to generate real-time reports by pulling from Chronicles. However, beginning in March 2019, Epic began to deny CureIS's requests for data, files, and configurations that CureIS needed to adapt its process to the Epic environment.  Despite the fact that this data belonged to the *customer*, Epic did not honor these requests.  Instead, Epic deliberately delayed its responses and provided ever-shifting excuses as to why it could not provide this information. Throughout this time, Epic wrongfully denied CureIS's customers access to their own data to thwart CureIS's solutions from working.  Epic did this for the purpose of harming CureIS's customer relationships.

69.     On June 18, 2019, ▮▮▮▮▮ Healthcare IT Director, ▮▮▮▮▮▮▮, emailed ▮▮▮▮▮s Epic representatives and requested that Epic provide CureIS access to ▮▮▮▮▮s data. Epic informed ▮▮▮▮▮ that CureIS would need to complete an "Application for Access form" to receive access to the data CureIS needed.



70.     After a few questions about how to fill out the form correctly, CureIS's COO, Bret Randolph, filled out the form that same day.  But on July 10, 2019, almost one month after ▮▮▮▮▮ made the request and CureIS submitted Epic's requested form, ▮▮▮▮▮ informed CureIS that "the Vendor Relations team at Epic has **denied CureIS access to Clarity** due to them being a direct competitor with Tapestry Enrollment and Eligibility functionality."

71.    Sawotin responded to ▮▮▮▮ message by clarifying that "I believe we must have some confusion regarding our products functionality.  This is very much a complimentary [sic] product and not competitive."

72.    ▮▮▮▮ informed Sawotin that they had "reached out to Epic and asked [Epic] to facilitate a discussion with CureIS to see how we can structure an access agreement that addresses the **Epic concerns**." Sawotin responded "That is great news.  I honestly believe it just a misunderstanding of the service.  I do not see any overlap with their capability.  This actually *makes Tapestry run more efficiently*." ▮▮▮▮ responded, "Thanks Chris, I am sure we will work this out. Not used to this restriction. LOL new world. Ok ill reach out to you as soon as I can!"

73.    Despite ▮▮▮▮ optimism and express desire to provide its data to CureIS, Epic never authorized CureIS to receive access to ▮▮▮▮s data.  Instead, as a result of being unable to receive its EnrollmentCURE service, ▮▮▮▮ eventually informed CureIS in 2020 that they would no longer pay for CureIS's services. After similar requests from ▮▮▮▮ to try integration once more, and then the same obstructive tactics from Epic, and then this process stopping and starting many times over, ▮▮▮▮ finally cut off integration discussions with CureIS at the end of 2023, citing past issues with Epic gatekeeping data access.  Epic's refusal to facilitate integration, despite ▮▮▮▮ explicit request was not based on technical or security concerns but on Epic's false characterization of CureIS as a competitor, violating the 21st Century Cures Act's prohibition on information blocking (42 U.S.C. § 300jj–52(a)(1)).

4.    ▮▮▮▮

74.    Beginning in 2020, ▮▮▮▮ Executive Director of Claims Administration, ▮▮▮▮, advocated for ▮▮▮▮ to bring on CureIS's LettersCURE product. ▮▮▮▮ moved to ▮▮▮▮ in 2016 from a different managed care organization that used LettersCURE. With Epic, ▮▮▮▮ team had to manually create every single letter that went out to members and make fixes to problems that consistently occurred with the letters.  ▮▮▮▮ had addressed the need for a correspondence solution with Epic over several years and Epic had no response or fix.

75. As a result, ███████, again, pushed ████████s adoption of LettersCURE forward. On December 22, 2022, ████████ approved a project to implement LettersCURE. ████████ approved CureIS's budget to begin work in 2023 for the 2023-2024 fiscal year. That same day, CureIS met with ████████ to conduct a Contract Security Review.

76. On May 8, 2023, CureIS and ████████ held contract finalization meetings to take LettersCURE live, after ████████ had verbally agreed to a contract with CureIS. On May 17, 2023, CureIS received a question from ████████ about integrating LettersCURE with Tapestry. After receiving this question, contract discussions between CureIS and ████████ stalled out. Finally, on June 27, 2023, ████████ communicated to CureIS that the LettersCURE functionality would be handled "internally."

77. It soon became clear that Epic killed the project. Epic declared to ████████ it had serious but vague "concerns" about sharing data with CureIS. Epic induced ████████ to cease further efforts to implement CureIS's LettersCURE by imposing its Epic-first policy.

78. According to ██████, Epic put significant pressure on ████████ to kill the LettersCURE project. Epic asked ██████ if there was any other vendor she would consider working with besides CureIS. Epic informed ██████ that it had "issues" with giving CureIS access to data in Epic—even though this data belongs to ████████, not Epic, and the law prohibits Epic from blocking the sharing of ████████s EHI.

79. After Epic killed CureIS's LettersCURE contract by threatening to impose (illegal) data restrictions, CureIS and ████████ did not work together for over a year. However, ████████ reengaged CureIS in August 2024 following a large data breach at Change Health in February 2024. Change Health is owned by UnitedHealth Group, and its system is the source of UnitedHealth member enrollment information. ████████ was concerned that interacting with Change Health after the data breach would expose their systems to potential breaches as well. On August 13, 2024, CureIS met with ████████████, Vice President of Value Payer Care. CureIS COO Bret Randolph proposed a solution wherein CureIS would act as a conduit between ████████ and UnitedHealth. CureIS's custom version of EnrollmentCURE would receive member enrollment information from UnitedHealth and ████████ and send

1    ████████████ a clean and accurate enrollment file. ████████████ specifically turned to CureIS for

2    help on this problem precisely because of CureIS's reputation for robust data security.  On August

3    16, 2024, CureIS sent the Product Description for the Enrollment Update Service for United Health

4    Care members.

5        80.   When ████████ brought this solution to ████████████s IT department in September

6    2024, the IT department informed ████████ that CureIS was not an Epic-approved vendor, and

7    therefore Epic would refuse to integrate with CureIS or grant CureIS access to ████████████s data,

8    shutting down the project.

9            **5.**   ████████████

10       81.   On January 1, 2024, CureIS met with prospective customer ████████████████████

11   ████████████████████████████ to conduct a deep dive on its RecoveryCURE product, which

12   ████████████ expressed interest in.  With discussions continuing, on February 5, 2024, ████

13   ████████ signed a non-disclosure agreement ("NDA") regarding a proposal for RecoveryCURE

14   from CureIS. On March 6, 2024, ████████████ hosted CureIS for an on-site meeting to address

15   workflow issues in coordination with ████████████' IT department.

16       82.   On May 22, 2024, and subject to the parties' NDA, CureIS sent ████████████ a 40-

17   page proposal detailing how it would implement its RecoveryCURE product at ████████████

18   specifically. This proposal contained specific workflows that would provide substantial value to ████

19   ████████  It also included a design specification of how CureIS would keep ████████████

20   information safe and secure, and a detailed explanation of how RecoveryCURE would specifically

21   solve ████████████' problems by customizing RecoveryCURE to ████████████' needs. The

22   proposal also contained confidential pricing information.

23       83.   On June 10, 2024, CureIS met with ████████████ CIO ████████████ and

24   CFO ████████████ to further discuss the impact RecoveryCURE would have on ████████████

25   business. During the course of CureIS's discussions with ████████████████████████████

26   informed CureIS that Epic did not have a solution like RecoveryCURE.

27       84.   In a surprising about face after months of productive discussions, on June 17, 2024

28   ████████████ informed CureIS that they could not work with CureIS because Epic imposed on

CUREIS'S FIRST AMENDED COMPLAINT

them an "Epic-first" policy. On information and belief, under the Epic-first policy, once a customer adopts Epic's EHR software or CAPS software, Epic requires that customer to abandon any preexisting third-party tools and forgo exploring non-Epic solutions at any point in the future if Epic believes it has a tool or service that overlaps with the third party's option—even if such third-party solutions offer superior functionality or are better tailored to the customer's unique needs. And in cases like this one, where Epic does not currently offer a tool that meets the customer's requirements, the Epic-first policy prevents customers from turning to necessary third-party alternatives like CureIS. These customers must simply go without for however long it takes Epic to build its replacement solution, which, as in this case, could take *years* (or never happen).

85.    Epic's Epic-first policy excludes rivals like CureIS from competing on the merits, regardless of whether they offer better, more specialized, or more innovative products, stifling innovation and further concentrating the EHR and CAPS software markets. Epic's exclusivity arrangement with its customers substantially forecloses CureIS, and all companies that Epic labels as competitors (or future competitors), from reaching a critical mass of managed care organizations that exhibit demand for CureIS products. The anticompetitive effect of the Epic-first policy extends beyond the MCM software market to a staggering 323 related or vertically integrated product markets. *See infra* ¶ 98.

86.    There is no procompetitive purpose to Epic's information blocking. As mentioned previously, in 2016, Congress enacted the Cures Act, which is a federal law designed to, *inter alia*, accelerate medical product development and improve healthcare information access. As most relevant to this case, it ensures the free flow of patients' health information and interoperability between different systems and products, so that (among other things) a company cannot establish itself as a bottleneck for EHI, thereby increasing healthcare costs and increasing the sorts of inefficiencies the Cures Act sought to remedy.

87.    Among the Act's requirements are that healthcare IT developers (like Epic) cannot engage in "information blocking" of EHI. 42 U.S.C. § 300jj–52(a)(1); *see also* 45 C.F.R. § 171.103(a)(1) (defining practices that constitute information blocking by health IT developers). Similarly, entities like Epic also must certify and then ensure that they do not "inhibit the appropriate

exchange, access, and use of electronic health information." 42 U.S.C. § 300jj-11(c)(5)(D)(ii). Nor can they prohibit or restrict communication regarding the usability or interoperability of health information technology. 42 U.S.C. § 300jj-11(c)(5)(D)(iii). And they must publish application programming interfaces ("APIs") that "allow[] health information from such technology to be accessed, exchanged, and used without special effort" through the API. 42 U.S.C. § 300jj-11(c)(5)(D)(iv).

88.    Epic's campaign against CureIS and MCM software in general violates each of these precepts and, thus, undercuts the competitive playing field Congress established via the Cures Act. As discussed herein, Epic has blocked information (and continues to do so) by refusing to allow MCOs using Epic CAPS software to use CureIS products to access and utilize customer-authorized EHI. It has inhibited the appropriate exchange, access, and use of EHI. It has prohibited and restricted communications regarding the usability and interoperability of health information technology. It has not allowed use of APIs meant for the purposes of accessing, exchanging, and using EHI "without special effort."

89.    In short, Epic has engaged in a wide-ranging and systematic pattern of practices designed to prevent the effective exchange of EHI—all because of its anticompetitive, tortious, unlawful, and unfair designs. Epic requires CureIS and its customers to navigate unnecessarily complex data architectures, forcing them to extract data through multiple layers rather than providing direct access to complete datasets. Critical information such as referral data and provider notes remain trapped in unstructured fields that Epic refuses to make accessible through its environment, despite this information being essential for accurate claims processing. Even when Epic does provide data access, it supplies delayed information that can result in unnecessary claim denials. On top of all of these illegal measures, Epic simply mandates that customers using its software not use any MCM software.

**B.    Raising Unfounded Security Concerns to Defame CureIS**

90.    Whenever an Epic customer has asked Epic to integrate with one of CureIS's solutions, Epic has claimed it "wasn't comfortable" with CureIS accessing its systems. Epic's messaging around why it supposedly "wasn't comfortable" was that CureIS's products supposedly

presented a data-security risk. CureIS is aware that Epic raised false and unfounded security concerns during critical transition periods for at least the following former CureIS customers: ███ ███ in August 2024, ███ in 2024, ███ on February 2, 2023, and ███ in March 2023. But given that CureIS obviously is not privy to these communications in most instances, CureIS understands that they are far more widespread than the specific customers listed herein who have directly informed CureIS of Epic's misstatements.

91.   Epic made these false statements with malice and only for the purpose of harming CureIS's reputation and relationships. Epic had no legitimate basis to raise security concerns, and Epic was fully aware that any security-based justifications for blocking integrations with CureIS were entirely pretextual. In fact, Epic was directly involved in situations where CureIS's products were specifically selected by mutual customers to address security concerns associated with existing systems because of CureIS products' superior security. For example, in 2023, ███████ sought out CureIS to protect its data from the possible data security risks on its existing *Epic* system.

92.   When Epic urges a would-be customer to block CureIS's access to customer data because of implied or explicit (but untrue) concerns about CureIS's data security, that is deeply harmful to CureIS, given that one of its primary selling points is its ability to ensure the safekeeping of sensitive health data. CureIS goes to great lengths to ensure that its services are fully compliant with healthcare data security regulations, including HIPAA.

93.   Epic's false and disparaging comments about the potential security risk of CureIS integrating with Epic Tapestry or accessing data through Epic's systems were likely to induce and did induce reliance.  Once a customer has switched or taken steps to switch its platform to Epic, any decision that would undermine that transition or might require another underlying system change is extremely costly.  Put simply, customers cannot afford not to go along with Epic's fearmongering about CureIS integration.

94.   Epic's false statements are not susceptible to neutralization. In healthcare IT markets, data-security claims are particularly difficult for customers to verify independently. The complex, specialized nature of managed care enrollment and eligibility systems prevents customers from easily assessing the accuracy of Epic's disparaging statements about CureIS's products. Without

access to the necessary infrastructure (which Epic improperly blocks), CureIS cannot effectively showcase its solutions or prove they do not pose the security concerns Epic alleges. Further, and as discussed, the timing of Epic's disparaging statements, during critical customer transition periods, was calculated to exact the most harm and most effectively prevent customers from pushing back. By the time CureIS discovered Epic's misrepresentations, customers had already implemented irreversible decisions based on Epic's falsehoods. And Epic knows this.

95.    False claims about data security in healthcare settings create lasting reputational damage that persist even after factual corrections. When Epic tells CureIS's customers it is "uncomfortable" integrating with CureIS—especially during critical system transitions—such insinuations carry significant weight in a highly regulated, risk-averse industry where hospital IT departments tend to follow the lead of the large majority of hospitals (including all of the top-ranked hospitals) using Epic.

96.    Epic's statements were intended to and did cause harm to CureIS's business. For example, in or around June 2023, Epic knowingly induced ██████████ to cease onboarding CureIS's LettersCURE product by claiming it had serious "concerns" about sharing data with CureIS.    At the end of 2023, Epic also expressed vague concerns about integrating with EnrollmentCURE to the IT department at ████████ ████. Thereafter, ████████ terminated its contract with CureIS.

## C.    Epic's Acts Against CureIS Are Part Of A Broader Attempt To Dominate PSHP CAPS Software And Take Over Nearly Every Part Of The Healthcare Information Technology Industry

97.    Epic is unabashed about its goal to use its role as industry gatekeeper for third-party developers of EHR-integrated solutions as a tool for ever more dominance. As noted above, Epic is executing its strategic expansion beyond its core EHR and billing functions into multiple adjacent and vertically related markets.

98.    As Epic notes in a brochure called "Products You Can Replace with Epic," it urges its customers to use Epic instead of competitors for 323 related products under 21 categories, including Patient Access, Patient Digital Experience and Customer Relationship Management, Population Health, Analytics and Machine Learning, Payer Data Integration, and Enterprise Billing.

Of these products, 16 are "under development," which means they are not currently available. The brochure is meant to "identify areas where you could use your Epic software to either replace or avoid purchasing niche applications." Recipients are instructed to "Contact your Epic BFF ["best friend forever"] to evaluate your application mix and your functionality needs to see what could be replaced with Epic." The brochure also includes a list of capabilities Epic does not intend to develop or offer in the future, "Systems You Keep for Now," including, for example, "Mass postcard generation," "E-faxing," and "Telephony and fax."



99.    This brochure directly shows the motivation behind Epic's attacks on CureIS and numerous other innovators and competitors, and (alongside the specific statements described above) is part of Epic's broader false advertising. Indeed, "Epic has marketed the introduction of new products, and in some cases products that don't exist yet, for the apparent purpose and unmistakable

1  impact of reducing market demand for competitor products."[13] But as explained herein, Epic's

2  representations to customers regarding its current or in-development product features are often

3  completely false—as exemplified by its attacks on CureIS itself.

4       100.  This brochure is also direct evidence of Epic's foreclosure strategy. The brochure

5  defines what Epic itself considers dependent or vertically integrated product markets—markets

6  where Epic is warning of its plans to exert its influence. In addition to coercing customers to adopt

7  Epic's products they do not want, Epic is coercing customers into adopting its forthcoming and

8  under-development solutions in lieu of third-party ones that already exist and outperform,

9  effectively stifling competition not because of superior product quality but because of its gatekeeper

10  control over the critical EHR infrastructure. The brochure lays bare Epic's own view of the product

11  markets it can take control of whenever it wants by leveraging its entrenched position at the center

12  of the healthcare IT ecosystem. But, just as importantly, it also identifies the product markets it

13  views as potential threats and thus subject to its "Epic-first" requirements and coercion.

14       101.  For example, to this point, although Epic has failed to deliver on a replacement

15  product to compete with CureIS, the effect of Epic's conduct has been devastating to CureIS's

16  business, to customers, and to the market more generally. Multiple customers terminated or

17  significantly disrupted activity under their contracts with CureIS following Epic's interference,

18  including ▮▮▮▮▮▮▮▮, and ▮▮▮▮▮▮. Other potential customers declined to proceed

19  with engagements after Epic's disparagement and obstruction.

20  **HARM TO COMPETITION & ANTITRUST INJURY**

21       102.  In its zeal to solidify its dominance over managed care claims processing, Epic has

22  caused widespread harm to the MCM software market (and CureIS specifically). This has, in turn,

23  led to lower output in that market, as well as lower market wide product quality. More specifically,

24  fewer customers are using MCM software at all because of the Epic conduct described in this

25  Complaint. Epic has also limited the functionality MCM software customers can use, meaning that

26

27      [13]  Seth Joseph, *Epic's Antitrust Paradox: Who Should Control the Levers of Healthcare*

28  *Innovation?*, Forbes (Feb. 26, 2024), https://www.forbes.com/sites/sethjoseph/2024/02/26/epics-antitrust-paradox-who-should-control-the-levers-of-healthcare-innovation/.

the benefits of fully functional MCM software are often not available at all, and are becoming less and less available as Epic takes up more of the PSHP CAPS software market. Epic's anticompetitive conduct has also led to higher prices for PSHP CAPS software because Epic's efforts to eliminate sources of reduced switching costs leads to corresponding reductions in its need to compete on price for PSHP CAPS software. Finally, Epic's conduct has also led to higher healthcare costs because Epic has attacked powerful ways that MCOs can reduce their own costs and increase efficiencies, thereby expanding and improving insurance coverage. This ultimately harms the patients that often unknowingly benefits from MCOs' use of MCM software.

103. Epic's assault on MCM software providers represents a broader strategy to systematically destroy healthcare information technology innovation by making it virtually impossible for superior technologies to reach customers—and all because of Epic's rapacious desire to control virtually every product market in the healthcare IT sector. CureIS's system-agnostic products, for example, can receive data in multiple formats, clean the data, and convert such data into a portable format that can be ingested into any system, enhancing interoperability between EHR, CAPS, and other software applications made by different companies while reducing costs for customers.

104. Epic recognizes that widespread adoption and continued growth of MCM software would make the CAPS software market more competitive and threaten Epic's ability to force its customers to use only Epic products. Epic unilaterally cut off CureIS's customers' ability access their own data to harm CureIS (and, on information and belief, other MCM software providers) software, notwithstanding its customers' protests. Epic's actions were not meant for any legitimate aim, but rather to ultimately displace CureIS's and other MCM software providers' innovations and switching cost reductions.

105. Epic's pattern of exclusionary conduct serves no legitimate or procompetitive purpose. At bottom, by preventing its customers from using third-party products like MCM software, Epic prevents them from utilizing their own data in a way that maximizes efficiencies, reduces costs, and expands the scope of the services they offer. And Epic prevents them from doing so in order to maximize Epic's competitive position simply because it seeks ever more growth and

ever more control over the healthcare IT industry, and because it wishes to continue to extract supracompetitive prices for products that are demonstrably lower-quality and/or substantially more limited and/or unable to provide the same functionality as other companies' offerings.

## CUREIS'S HARM

106.  Due to Epic's conduct, CureIS's revenues have declined significantly, and its growth trajectory has been stunted. CureIS has also been forced to expend significant time and resources to attempt workarounds or appeal to Epic for data access that should have been readily available when their mutual customers authorized such access (not many years later, in a deteriorated inferior state, or not at all).

107.  Epic's interference and other conduct also directly interfered with CureIS's acquisition by a major private equity firm when Epic's interference emerged as a material concern during the diligence process in summer 2024. CureIS had attracted interest from over 100 potential acquirers through a competitive process and narrowed its options to approximately six serious bidders. As of September 2023, CureIS received a Letter of Intent offering to buy the business for a nine-figure amount. As part of that diligence, CureIS needed to disclose the reason it had lost its first customer ever in over two decades of business. The reason was Epic, which was obstructing the customer's ability to access its own data to provide access to CureIS, leaving the customer with no choice but cease working with CureIS. Once prospective buyers learned of Epic's interference, the sale process collapsed. Investors have since shared with CureIS that they are hesitant to invest a single dollar in companies even at the fringes of "Epic's development crosshairs." This has transformed CureIS from a rapidly growing company with approximately 20%-25% annual growth into a business with 3%-5% growth, solely due to Epic's conduct. And, on information and belief, other MCM software providers have suffered (and are suffering) a similar fate.

## INTERSTATE TRADE AND COMMERCE

108.  Epic's conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that, inter alia:

(a) Epic provides Tapestry throughout the United States;

(b) Epic has used instrumentalities of interstate commerce to provide Tapestry throughout the United States;

(c) In furtherance of the anticompetitive scheme alleged herein, Epic employees have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

(d) The anticompetitive scheme alleged herein has affected billions of dollars of commerce. Epic has inflicted antitrust injury by artificially excluding CureIS and other competitors and causing the other antitrust injuries described herein.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF THE SHERMAN ACT SECTION 1 (15 U.S.C. § 1): EXCLUSIVE DEALING

109.  CureIS incorporates the foregoing paragraphs by reference as though fully set forth herein.

110.  As alleged above, Epic has market power in the EHR and PSHP CAPS software markets.

111.  As alleged above, Epic and various customers have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Epic in the relevant market for PSHP CAPS software.

112.  The contracts, combinations, or conspiracies include but are not limited to long-term exclusive dealing arrangements with customers for its EHR and/or CAPS software product, Tapestry.

113.  As alleged above, Epic requires customers of those products to adhere to an "Epic-first" policy, which prohibits those customers from utilizing non-Epic approved third-party applications in at least 323 different product categories, including MCM software.

114.  Epic's conduct has had an anticompetitive effect in the relevant markets for PSHP CAPS software and MCM software.

115.  Epic's conduct has no legitimate business purpose or procompetitive effect.

116. There are less restrictive alternatives to the restraints Epic imposed on the relevant markets for PSHP CAPS software and MCM software.

117. Epic's conduct has had a substantial effect on interstate commerce.

118. CureIS has been and will be injured in its property as a result of Epic's conduct.

119. CureIS has suffered and will suffer injury of the type that the antitrust laws were intended to prevent. CureIS has been and will be injured by the harm to competition as a result of Epic's conduct.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE SHERMAN ACT SECTION 2 (15 U.S.C. § 2):**
**MONOPOLY MAINTENANCE**

</div>

120. CureIS incorporates the foregoing paragraphs by reference as though fully set forth herein.

121. As alleged above, Epic possesses monopoly power in the relevant market for PSHP CAPS software.

122. Epic has willfully maintained its monopoly power in PSHP CAPS software through exclusionary and anticompetitive conduct not based on superior product, innovation, or competition on the merits, but instead, to block the use of software products (MCM software) that would reduce the leverage and power Epic is able to exercise over managed care software customers, once they select it as their CAPS software provider. These acts include:

(a) requiring customers to abide by exclusive dealing arrangements by way of an "Epic-first" policy, according to which they cannot use any third-party product if Epic contends that it either offers or intends to offer that type of product in the future;

(b) blocking CureIS's customers' access to their own data to prevent them from utilizing third-party MCM software solutions;

(c) imposing technical barriers that offer EHR or CAPS customers no product improvements, and/or relegating third-party vendors to non-operational, stale, incomplete, and error-prone data repositories to inhibit the function or reduce the quality of their products; and

(d) disparaging CureIS and other MCM software providers throughout the market to mutual customers and misrepresenting Epic's product options and product qualities.

123. Epic's conduct has had an anticompetitive effect in the relevant markets for PSHP CAPS software and MCM software.

124. Epic's conduct has no legitimate business purpose or procompetitive effect.

125. There are less restrictive alternatives to the restraints Epic imposed on the relevant markets for provider-sponsored health plan CAPS software and MCM software.

126. Epic's conduct has had a substantial effect on interstate commerce.

127. CureIS has been and will be injured in its property as a result of Epic's conduct.

128. CureIS has suffered and will suffer injury of the type that the antitrust laws were intended to prevent. CureIS has been and will be injured by the harm to competition as a result of Epic's conduct.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF THE SHERMAN ACT SECTION 2 (15 U.S.C. § 2): ATTEMPTED MONOPOLIZATION

129. CureIS incorporates the foregoing paragraphs by reference as though fully set forth herein.

130. Epic has engaged in predatory, exclusionary, and anticompetitive conduct as described more fully above.

131. Epic has engaged in that conduct with the specific intent of monopolizing the relevant market for PSHP CAPS software because it seeks through these acts to prevent, and has prevented disintermediation—specifically, the ability of Epic's customers to use third-party tools, like CureIS's data-agnostic middleware, to manage workflows between EHR and CAPS systems and therefore increase their flexibility in choosing different providers' options for each type of software (and to switch, when desired).

132. Epic has engaged in that conduct with a dangerous probability of monopolizing the relevant market for PSHP CAPS software.

133. Epic's conduct has had an anticompetitive effect in the relevant markets for PSHP CAPS software and MCM software.

134. Epic's conduct has no legitimate business purpose or procompetitive effect.

135. There are less restrictive alternatives to the restraints Epic imposed on the relevant markets for PSHP CAPS software and MCM software.

136. Epic's conduct has had a substantial effect on interstate commerce.

137. CureIS has been and will be injured in its property as a result of Epic's conduct.

138. CureIS has suffered and will suffer injury of the type that the antitrust laws were intended to prevent. CureIS has been and will be injured by the harm to competition as a result of Epic's conduct.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**TORTIOUS INTERFERENCE WITH CONTRACT**

</div>

139. CureIS incorporates the foregoing paragraphs by reference as though fully set forth herein.

<u>Service Agreement Terminations</u>

140. CureIS and ▮▮▮▮ entered into a "CureIS EnrollmentCURE® Software Subscription License Agreement" on September 14, 2018. The subscription term was an initial three years, starting on January 1, 2019, with automatic renewals.

141. CureIS and ▮▮▮ entered into a Subscription Services Agreement on July 1, 2020, and an addendum on July 18, 2023.

142. CureIS and ▮▮▮ entered into a "CureIS EnrollmentCURE® Software Subscription License Agreement" on August 29, 2018, and an amendment to that agreement on August 5, 2019.

143. The ▮▮▮▮, and ▮▮▮ Agreements were at all relevant times valid, binding, and enforceable contracts. Under the terms of these Agreements, CureIS's customers agreed to pay monthly fees to CureIS in exchange for the right to use CureIS's products.

144. At all relevant times, Epic was aware of CureIS's agreements with these customers.

145. ▮▮▮▮ and ▮▮▮ terminated valid and enforceable contracts with CureIS at Epic's direction.

146. ▮▮▮ ceased paying its monthly fees to CureIS in or around January 4, 2022, after a termination date of December 31, 2021.

1   147. ███████████ and ███████████ stopped running EnrollmentCURE on its

2   members on March 1, 2024, the date that █████ switched over to Epic. ███████████ stopped

3   running EncounterCURE on March 1, 2024 as well. ███████████ is running a diminished

4   version of EncounterCURE as of March 1, 2024, but CureIS has been informed that █████

5   █████ is planning to end its contract for EncounterCURE in the near future.

6   148. █████ significantly reduced the monthly fees it pays to CureIS in February 2025 in

7   connection with its decreased use of EnrollmentCURE as a result of Epic's interference.

8   149. █████ ceased paying its monthly fees to CureIS on March 11, 2022, prior to the

9   termination date of March 31, 2022.

10   150. Epic intentionally procured ███████████, and █████'s termination without

11   justification, with the purpose of harming CureIS. To this end, Epic engaged in independently

12   wrongful conduct, including, for example, falsely disparaging CureIS, blocking CureIS's access to

13   critical customer data, and making fraudulent statements to CureIS's longstanding customers to

14   undermine their confidence and induce contract terminations. Epic's conduct was improper,

15   conducted with malice, and is without privilege or justification.

16   151. The termination of the contracts would not have occurred but for Epic's conduct.

17   152. Because of Epic's conduct, CureIS has suffered, and continues to suffer, damages in

18   an amount to be determined at trial.

19   153. Epic had knowledge of the contracts between ███████████, and █████

20   █████ and CureIS. Epic's intentional acts and independently wrongful acts were designed to

21   induce a termination of these contractual relationships.

22   154. Because of Epic's conduct, CureIS has suffered, and continues to suffer, damages in

23   an amount to be determined at trial.

24

25   **FIFTH CLAIM FOR RELIEF**
     **TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**

26   155. CureIS incorporates the foregoing paragraphs by reference as though fully set forth

27   herein.

28

156. Epic knowingly interfered with CureIS's prospective business relationships with at least ████████████████████████████████████, and █████ CureIS had existing contracts or was in advanced negotiations with these entities for EnrollmentCURE, RecoveryCURE, LettersCURE, and/or EncounterCURE, creating a strong probability of future economic benefit, including, for example: (a) ████████████ December 22, 2022 approval of a LettersCURE project and corresponding 2023–2024 budget allocation; (b) ████████████' February 5, 2024 execution of a non-disclosure agreement for RecoveryCURE, followed by an on-site meeting on March 6, 2024 and CureIS's submission of a 40-page implementation proposal on May 22, 2024; and (c) CureIS's contract with ████████ to provide EnrollmentCURE, signed on September 18, 2018, with ████████ actively pursuing EnrollmentCURE integration with Epic through August 2023.

157. Epic was aware of CureIS's existing and prospective economic relationships with these customers, as evidenced by Epic's explicit acknowledgement to ████████Healthcare IT Director that CureIS was a "direct competitor with Tapestry Enrollment and Eligibility functionality," its communications with ████████ Executive Director directing her to "not go forward" with the CureIS LettersCURE contract, and Epic's communications with ████ ████████, instructing ████████ not to work with CureIS because of the "Epic-first policy" in June 2024.

158. Epic's independently wrongful acts were designed to disrupt CureIS's economic relationships: (a) Epic made numerous false and misleading statements to CureIS's customers that integrating with CureIS presented security concerns and that Epic's products could replace CureIS's solutions with equivalent functionality, despite knowing these statements were untrue; and (b) Epic wrongfully denied CureIS access to customer data that customers had expressly authorized CureIS to access in violation of the 21st Century Cures Act's prohibition on information blocking of EHI, which includes enrollment and claims data containing individually identifiable health information.

159. As a direct result of Epic's wrongful conduct, CureIS's relationships with current and future customers were actually disrupted: (a) ████████ terminated its LettersCURE project on June 27, 2023, directly after Epic interfered, despite having previously approved the project and budget; (b) ████████ abruptly reversed its decision to implement RecoveryCURE on June 17,

2024, after extensive negotiations and a detailed implementation proposal, again, after Epic interfered; (c) ███████ terminated CureIS's services in 2023 after Epic denied CureIS access to necessary data; and (d) ████████████ stopped using CureIS's EnrollmentCURE and significantly reduced use of EncounterCURE in or around March 1, 2024 after Epic denied CureIS access to necessary data and disparaged CureIS to ████. Epic intended or should have known that these disruptions were certain or substantially certain to occur as a result of its wrongful conduct.

160. The loss or significant deterioration of CureIS's business relationships with ████████ ████████████, and ████████████ would not have occurred but for Epic's interference, as each of these organizations did not move forward with CureIS because and only because Epic explicitly instructed them not to.

161. Epic's wrongful acts proximately caused substantial economic harm to CureIS. Because of Epic's conduct, CureIS has suffered, and continues to suffer, damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### TRADE LIBEL

162. CureIS incorporates the foregoing paragraphs by reference as though fully set forth herein.

163. Epic has intentionally made false statements to CureIS customers and prospective customers disparaging the security of CureIS's products, including EnrollmentCURE, EncounterCURE, RecoveryCURE, and LettersCURE.

164. Epic's false statements include communicating to ████████████ in June 2023, ████████████ in June 2024, ██████ on or around February 2, 2023 and 2024, and ████████ in February 2023 that CureIS's products posed security risks when interfacing with Epic's systems and citing such concerns to block access to data when Epic knew no such risks existed. Epic knew of CureIS's economic relationships with these customers, and knew that its false statements would disrupt these economic relationships.

165. Epic's purported security concerns were pretextual. Epic admitted to ████████████ ██████████ IT Director, ████████████, that the reason for denying CureIS access had nothing to do

with data security, but rather, because Epic viewed CureIS as "a direct competitor." Epic made these statements with knowledge of their falsity because Epic had no basis to claim CureIS products presented any security risks. In fact, Epic was aware of its own customers seeking CureIS out *because of* CureIS's data security superiority.

166. CureIS has been harmed by Epic's statements that CureIS's products pose security risks. As a direct result of Epic's trade libel, CureIS has suffered specific economic losses, including termination of existing contracts with ███████████████████, and ██████, and lost revenue from licensing fees for its EnrollmentCURE, EncounterCURE, RecoveryCURE, and LettersCURE products.

167. Epic acted maliciously because it knew or should have recognized that CureIS's existing and prospective customers would act in reliance on its false statements regarding CureIS, and that those statements would cause CureIS financial harm.

168. Epic's knowingly false statements caused both reputational and financial harm to CureIS, and also injured CureIS's existing and prospective customers by depriving them of the substantial benefits and cost savings offered by CureIS's products.

## SEVENTH CLAIM FOR RELIEF
### FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(A)

169. CureIS incorporates the foregoing paragraphs (except paragraphs 85 through 95, and paragraphs 131 through 139) by reference as though fully set forth herein.

170. As alleged above, Epic has purposefully made false and misleading statements of facts through commercial statements concerning CureIS's reputation and CureIS's products, as well as about Epic's products and product line up.

171. Epic's deception is material, in that it is likely to—and in many cases, did in fact—influence the purchasing decisions of the public for whom it was intended.

172. Epic introduced its false and misleading statements into interstate commerce via press releases, brochures, other online communications, and communications with CureIS's potential and actual customers.

173. CureIS has been injured as a result of Epic's false statements.

174.  CureIS has suffered commercial injury based upon Epic's misrepresentations.

175.  CureIS's injury is competitive, *i.e.*, harmful to CureIS's ability to compete.

176.  Epic's conduct as alleged is willful and exceptional, such that CureIS is entitled to an award of treble damages and its attorneys' fees.

## EIGHTH CLAIM FOR RELIEF
### UNLAWFUL AND UNFAIR COMPETITION (CAL. BUS. PROF.  CODE § 17200, *et seq.*)

177.  CureIS incorporates the foregoing paragraphs (except paragraphs 85 through 95, and paragraphs 131 through 139) by reference as though fully set forth herein.

178.  Epic's conduct violates California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits unlawful, unfair or fraudulent business acts or practices.

179.  CureIS has standing to bring this claim because it has suffered economic harm and has lost customers and subscription fee revenue, among other harms, as a result of Epic's unfair competition.

180.  Epic's conduct is unlawful under California's False Advertising Law (Cal. Bus. & Prof. Code § 17500), the Cures Act, 42 U.S.C. § 300jj–52(a)(1) (prohibiting health IT developers from engaging in information blocking), 45 C.F.R. § 171.103(a)(1) (defining practices that constitute information blocking by health IT developers), and the Federal Lanham Act as false and misleading commercial speech, in addition to constituting unlawful trade libel.

181.  For all these reasons, Epic's conduct is also unfair under the UCL. Epic's conduct is additionally unfair because Epic's tortious interference, false advertising, and disparagement were designed to harm CureIS's ability to compete, thereby restraining competition.

182.  Epic's conduct is also fraudulent under the UCL. Epic falsely represented to CureIS's customers that Epic either offered or could develop replacement solutions to CureIS's to induce them to terminate their relationships with CureIS. If that did not work, Epic proceeded to block CureIS's integration by blocking CureIS's access to mutual customers' data. Many of these customers had been CureIS's customers for close to two decades.

183.  As a direct result of Epic's unlawful, unfair, and fraudulent conduct, CureIS has suffered significant harm, including lost revenue in the form of lost licensing fees, reputational harm, and the demise of valuable long-term customer relationships, which, before Epic's interference, were projected to expand.

184.  Absent injunctive relief, CureIS will suffer loss of money or property, and thus has standing to seek relief under section 17200.

### NINTH CLAIM FOR RELIEF
### UNFAIR COMPETITION/FALSE ADVERTISING (CAL. BUS. & PROF. CODE § 17500)

185.  CureIS incorporates the foregoing paragraphs (except paragraphs 85 through 95, and paragraphs 131 through 139) by reference as though fully set forth herein.

186.  Epic regularly advertises products it does not actually make, including, by example, by widely disseminating the "Products You Can Replace with *Epic*" brochure, which falsely represents that Epic offers products or product features it does not offer.  Epic also similarly falsely represented to CureIS's actual and potential customers that Epic's products or product features are capable of fully replacing CureIS's products to induce CureIS's customers to sever their contractual and other business relationships with CureIS.

187.  Epic knew, or by exercise of reasonable care should have known, that its representations regarding its product features or when it was likely to develop a new product feature were false.

188.  Epic's false advertising of the products or product features customers can replace with Epic are likely to deceive members of the public, as a reasonable prospective customer would consider Epic's representations regarding its product features to be accurate.

189.  CureIS customers and the healthcare market more broadly were deceived by Epic's false advertisement of its product features or products under development and as a result, terminated their relationships with CureIS and stopped paying licensing subscription fees for CureIS's EnrollmentCURE, LettersCURE, EncounterCURE, and RecoveryCURE.

190. As a result of the Epic's false advertising about its products and/or product features, CureIS's customers and Epic's customers have been deceived into accepting inferior or non-existent Epic products.

191. To prevent future harm to the public, Epic should be enjoined from advertising that it offers products or product features it does not currently offer.

192. CureIS is entitled to attorneys' fees incurred to prosecute this action under Code of Civil Procedure section 1021.5 because stopping Epic's false advertising will significantly benefit the public, prosecuting the action will require significant expense on the part of CureIS, and, in the interest of justice, any award of attorneys' fees should not be paid out of CureIS recovery.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CureIS prays for judgment against Epic as follows:

A.  Adjudication that the acts alleged herein violate state laws alleged herein;

B.  Adjudication that the acts alleged herein constitute an unreasonable restraint of trade, monopoly maintenance, and/or attempted monopolization in violation of the Sherman Act, 15 U.S.C. §§ 1, 2.

C.  Adjudication that the acts alleged herein constitute false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a).

D.  Actual and treble damages, statutory damages, disgorgement, restitution, punitive or exemplary damages, royalties, and such other relief as provided by the federal statutes, state statutes, and state common law cited herein;

E.  Pre-judgment and post-judgment interest on such monetary relief;

F.  Equitable relief in the form of enjoining Epic from engaging in the anticompetitive acts, false advertising, unfair and unlawful competition, and other tortious conduct alleged herein;

G.  Equitable relief as may be required to restore competition and to prevent the recurrence of future statutory and tort violations alleged herein;

H.  The costs of bringing this suit, including reasonable attorneys' fees; and

I.  All other relief as the Court deems just and proper.

DATED:  July 14, 2025                    QUINN EMANUEL URQUHART &
                                         SULLIVAN, LLP


                                         By   _/s/ Paulina Slagter_____
                                             Adam Wolfson
                                             Paulina Slagter
                                             Attorneys for Plaintiff

CUREIS'S FIRST AMENDED COMPLAINT